Filed 7/22/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061946 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD228929) |
| LEOPOLDO CHAVEZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed in part and reversed in part.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant Leopoldo Chavez.

Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant Edward Elias.

---

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I through V and VII of the Discussion.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser , Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants and appellants Leopoldo Chavez and Edward Elias of two counts of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the special circumstances of robbery-murder (§ 190.2, subd. (a)(17)) and multiple murders (§ 190.2, subd. (a)(3)).  The jury further found that Chavez and Elias were armed with a firearm within the meaning of section 12022, subdivision (a)(1).  Following their convictions, the court sentenced Chavez and Elias to two consecutive terms of life imprisonment each, without the possibility of parole, plus an additional consecutive year. The court later recalled the sentences to consider whether to impose a lesser punishment under section 190.5, subdivision (b), because Chavez and Elias were under the age of 18 at the time of their offenses.  After a further hearing, the court declined to modify the sentences.

Chavez and Elias appeal, contending that the evidence was insufficient to convict them of first degree murder or to support the special circumstances findings.  They further contend that (1) the court erred in instructing the jury using a modified version of CALCRIM No. 376, (2) the court erred by not instructing the jury regarding the natural and probable consequences doctrine, (3) the prosecutor committed prejudicial misconduct during closing arguments, (4) the sentences of life imprisonment without the possibility of parole violate the Eighth Amendment of the United States Constitution because they

---

1    Further statutory references are to the Penal Code unless otherwise noted.

were juveniles at the time of their offenses, and (5) the court erred by imposing parole revocation fines.

With two exceptions, we reject defendants' contentions on appeal. As we set forth more fully below, the 20- and 23-year-old victims were sailors enlisted in the United States Navy, one of whom was driving a brand new Toyota pickup truck. The victims were murdered at a location where young adults, including other Navy personnel and their friends, frequently gathered to drink, listen to music and socialize around a number of bonfires. Multiple witnesses recalled that Chavez, who was 17 at the time of the killings, was at the scene of the bonfires shortly before the murders took place. The witnesses also uniformly recalled that Chavez was in the company of at least one other teenager or young adult and that Chavez and his companion were acting in a very aggressive and threatening manner toward other Navy personnel and their friends present at the bonfires. Four days after the murders, Chavez was stopped in Tijuana, Mexico while driving the 20-year-old victim's new Toyota pickup truck. Importantly, some years after the murders, investigators were able to match DNA retrieved from the pants pocket of the 20-year-old victim with Chavez's DNA.

The witnesses' identification of Chavez as being present at the bonfires shortly before the murders, his possession of the truck following the murders, and his DNA in the pants pocket of one of the victims, make a strong case Chavez participated in the truck robbery and the killings.

With respect to Elias, who was also 17 at the time of the murders, the record is sufficient to sustain his conviction and the special circumstances findings. Within just a few hours after the killings, investigators found a cigarette butt at the scene of the

3

murders among items that had been taken out of the Toyota truck. Later, investigators were able to match DNA on the cigarette butt with Elias's DNA. Elias's DNA was also found on a cup recovered from inside the victim's truck when it was stopped in Tijuana after the murders. In addition to the DNA on the cup, Elias's fingerprints were found both inside and outside of the truck.

The cigarette butt Elias left at the scene of the murders, with ash still attached, very near items discarded from the truck and recovered very shortly after the murders, places Elias at that location at or near the time of the murders. Elias's DNA, found in the cup retrieved from the truck, and his fingerprints, found both inside and outside of the truck, place Elias in the truck with Chavez shortly after the time it was stolen and near the time of the killings. These circumstances support the conclusion Elias was Chavez's companion at the bonfires and an active participant in the robbery and killings.

Thus, there is sufficient evidence to support Chavez's and Elias's murder convictions as well as the jury's felony-murder and multiple-murder special circumstances findings. We also reject defendants' claims that they were prejudiced by instructional error and that the prosecutor engaged in misconduct.

Because defendants were sentenced before *Miller v. Alabama* (Ala.Crim.App. 2010) 63 So.3d 676, certiorari granted June 25, 2012, ___ U.S. ___ [132 S.Ct. 2455] (*Miller*) and *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*) were decided and, because the record here does not show that the trial court had the opportunity to directly consider the ultimate issue presented in those cases, we reverse the life sentences without possibility of parole and remand for resentencing in light of *Miller* and *Gutierrez*. We also agree the trial court erred in imposing parole revocation fines.

4

FACTS

A. The Palms Bonfires

Early in the autumn of 1993, a large area of undeveloped land located near the intersection of Interstate 805 and Palm Avenue in southern San Diego County was known as "the Palms." The Palms was for the most part barren dirt and, on a fairly regular basis, it was the site of multiple simultaneous bonfires attended by various groups of young adults. Navy personnel and their friends who frequented a country western club located on a local Navy base, Anchors and Spurs, often met at the Palms after Anchors and Spurs closed for the night and socialized together around one or more of the bonfires.

On the night of September 24, 1993, a number of people from Anchors and Spurs attended a party at the Palms where there were two Anchors and Spurs bonfires. Witnesses estimated that the number of attendees ranged from 20 to 50 people. At the party, people smoked cigarettes, drank beer, and mingled. It was very foggy.

Two United States Navy sailors, 23-year-old Keith Combs (Combs) and 20-year-old Eugene "Cliff" Ellis (Ellis), were present at the Anchors and Spurs bonfires. Both young men carried wallets, base passes and military identification. Combs smoked exclusively Marlborough cigarettes.

That night, Ellis drove a brand new white Toyota pickup truck, which he had recently purchased with financial help from his father. Ellis's truck had fewer than 1,000 miles on the odometer. Ellis and Combs arrived at the Palms with two other sailors at approximately 7:30 p.m. but went back to their base with their two companions around 11:00 p.m. Once back at the Navy base, Ellis and Combs decided to return to the Palms.

5

When they returned to the party, Ellis parked his truck with the back bumper facing one of the Anchors and Spurs bonfires.

B.  Aggressive and Uncomfortable Behavior

During the hour between 4:00 a.m. and 5:00 a.m., members of the Anchors and Spurs party had experiences ranging from uncomfortable to distressing at and near where Ellis parked his truck.

1. *Behmke*

About 4:00 a.m., Barbara Behmke drove an Anchors and Spurs partygoer to the Balboa Naval hospital.  Behmke's acquaintance had been in a fight at one of the bonfires and was bleeding.  Behmke stayed at the hospital for a short period but returned to the Palms to look for a friend and find a jacket she had left at one of the bonfires.  When Behmke returned to the site of the bonfires, she encountered four young Hispanic males. Two of the young men approached her.  Behmke was later able to identify Chavez as one of the two young men.  Chavez made sexual gestures and remarks that made Behmke very uncomfortable.  According to Behmke, in response to her uncomfortable encounter with Chavez and his companion, she got in her truck and immediately left the area.

2. *Duvall*

Justin Duvall was also an enlisted member of the Navy and at the Anchors and Spurs bonfires on the morning of September 25, 1993.  Around 5:00 a.m., two teenagers approached Duvall.[2]  Duvall was later able to identify Chavez as one of the two teenagers who approached him.  The pair asked Duvall for beer.  One of the two

---

[2]    A third teenager was with the other two before any words were exchanged, but he did not approach Duvall.

6

teenagers had his hand behind his back in a manner that Duvall felt was very threatening. When Duvall declined to give them beer, Chavez and his companion responded "you fucking cowboys, we don't like your music." After Chavez and his companion returned to their own bonfire, Duvall immediately left the Palms with his friends. According to Duvall, he left immediately after his encounter with Chavez and his companion because: "I felt uncomfortable. I knew something wasn't right. That's when I decided we better leave."

    3. *Forde*

Stephen Forde was parked next to, and within four to five feet of, Ellis's truck at the Anchors and Spurs bonfire. On that evening, Forde was 18 years old and, like Combs and Ellis, an enlisted member of the Navy. Forde was concerned about and keeping an eye on a friend who was somewhat intoxicated. Forde noticed two teenage males, one of whom he was able to identify as Chavez, sitting in a vehicle about 15 feet outside the circle of cars at the Anchors and Spurs bonfire. Chavez and his companion caused Forde to be concerned. They were laughing, and something about their mannerisms made Forde feel that he needed to move away from the vehicle the teenagers were in and get to the other side of the bonfire. Forde thought Chavez and his companion were acting like "smart asses." When Chavez got out of the vehicle he was in and walked toward the rear of the vehicle, Forde moved to the opposite side of the bonfire. Forde left the Palms about 5:00 a.m.

    4. *Kowalow*

At approximately 5:00 a.m., Kristeen Kowalow saw three young men drive up to the Anchors and Spurs bonfire in a light-colored pickup truck with a camper shell. They

7

appeared to be Hispanic. Two of the young men got out of the vehicle, hung out at the back of their vehicle and began talking to Kowalow. When Kowalow was shown a photographic lineup, she testified that Chavez's photograph looked familiar. The two young men were dressed in baggy clothing, and their attitude made people in Kowalow's group nervous; because of how the two young men made them feel, Kowalow and her friends left the Palms bonfires around 5:00 a.m. When Kowalow left, the only people remaining at the bonfire were two sailors and the three young men in the light-colored pickup truck. The only vehicles left were the light-colored pickup truck and a newer white pickup truck. Kowalow later told investigators the pictures of Ellis and his truck looked familiar.

   5. *Macy*

Mary Macy and three friends were also at the Anchors and Spurs bonfire where Ellis had parked his truck. Although defendants' trial took place almost 19 years after the murders, Macy had a distinct memory of Ellis's truck because: "It was brand new, and I was admiring it, that that was the type of truck that I liked, that I would like to buy."

About 5:00 a.m., Macy suddenly realized just about everyone appeared to have left the bonfire party. She had a "bad feeling." Macy told her companions "we need to get out of here. Something is going on." Her companions got into Macy's vehicle. As Macy started to get into the driver's side of her car, a light-colored pickup truck with a camper shell pulled up next to her. Two young men were inside. One rolled a window down, and the two spoke to her in English but with what she believed were Hispanic accents. The two young men made Macy nervous, and she ignored them and left with her

8

friends.  When Macy was leaving, she noticed that only Ellis's brand new truck was still at the Anchors and Spurs bonfire.  She did not see Ellis or Combs.

C.  Crime Scene and Investigation

Between 7:00 a.m. and 7:30 a.m., a woman and her daughter were searching the Palms area for their son and brother and discovered the bodies of Combs and Ellis. Ellis's new pickup truck was no longer in the area.

1. *Examination of Remains*

Ellis's and Combs's bodies were in the dirt about 16 feet apart at the site of an extinguished bonfire.  Their bodies were pointed in the same direction, nearly parallel to each other and angled slightly toward each other at the heads.

Ellis was found face-up.  His body had fresh abrasions and bruises on his face and right lower leg, including a scratch on his face below his eye.  There was also an abrasion on the back of his head or upper part of his neck that was not caused by a bullet wound. Ellis's clothing was uncharacteristically disheveled, with his shirt untucked and his belt undone.  A U.S.S. Constellation ball cap was found lying between Ellis's feet.  It was crumbled and had dried vegetation on it, as if someone had stepped on it.  Blood was found on the ground on the vegetation area near Ellis and on his shirt.  He also had dried vegetation stuck to his face.  Because of the positioning of the body and location of blood, investigators concluded that he was initially face-down after being shot and had been rolled over onto his back before his body was discovered.[3]

---

[3]    At trial, Chavez offered expert testimony that Ellis was facedown for an extended period time, minutes or hours, before being rolled over.

Combs was found lying face-down on the ground, with dirt kicked up on his pant leg and arm.

Post mortem examination of the bodies revealed that each had suffered three fatal gunshot wounds, six shots in total, all fired by a single gun.  Ellis had an entrance gunshot wound in his chest; he also had a gunshot wound at his forehead and one in his back.  The shot to Ellis's chest was accomplished at a distance.  The shot to his head was made at very close range, within approximately an inch.  Ellis was alive at the time of each shot.

Combs was shot at close range, at three or four inches, in the middle of his back close to his spine.  This fractured the left side of his spine and rib and perforated the aorta and left lung.  He was also shot in the top of his head and at his left temple.  Two of the projectiles were recovered from his brain.  Combs was also still alive when each shot was inflicted, but any one of the wounds would have caused his death within minutes.

The coroner testified that Ellis and Combs died at some point between 1:20 a.m. and 5:20 a.m.

2. *Crime Scene DNA*

At the scene of the killings, on the ground between the bodies and clustered together within several square feet, investigators found various car care accessories that appeared to be from Ellis's truck, including a can of Armor All tire foam, a can of polishing compound, a scrub brush, a map, and a college brochure with Ellis's fingerprints on it.  The items were collected by investigators as a single evidentiary item, item 6.  A white shoe box was among the items from Ellis's truck identified in item 6, and it appeared the other items in item 6 had, at one point, been in the shoe box.

10

Within the area where investigators found the items identified in item 6, and near the scrub brush, investigators also found a recently smoked cigarette butt. The butt was from a Marlborough cigarette, the brand Combs smoked. It was collected separately as evidence item 7. The item 7 cigarette butt was 11 feet from Ellis's foot and 17 feet 8 inches from Combs's foot. The cigarette butt had ash still attached. Despite many footprints in the area and next to the bodies, no dust, dirt, footprints or tire tracks were on the cigarette butt, leading investigators to conclude it had recently been dropped there. Subsequent DNA testing revealed Elias was a major contributor to DNA found on the item 7 cigarette butt.[4] Additional, more sophisticated DNA testing revealed that the cigarette may have been smoked by as many as two other persons.

A second Marlborough cigarette butt, identified as evidence item 8, was found two feet two inches north of Combs. It had Combs's DNA on it. Like the first cigarette butt with Elias's DNA on it, this second cigarette butt also appeared recently smoked, as it had ash and a bit of paper remaining yet no footprints, dirt or dust on it. This cigarette butt was also believed to have been recently left at the scene.

Investigators also collected "touch" DNA samples from Ellis's pants pockets. Chavez was found to be a major DNA contributor to those samples. Investigators were unable to find either Combs's or Ellis's wallet or their military identification, which they would have needed to return to their Navy base.

---

[4]   Although investigators collected evidence at the scene for DNA testing, the testing itself did not take place until more than a decade later after testing methods had improved.

3. Recovery of Ellis's Toyota Truck

Four days after the murders of Combs and Ellis, Chavez was found driving Ellis's pickup truck in Tijuana, Mexico. Neither the locks nor the ignition had been forced, and the keys were found in the truck. Investigators recovered fingerprints from both Chavez and Elias on various surfaces of the interior and exterior of the truck. Chavez's fingerprints were found on the driver's side door, the driver's side mirror, the rearview mirror, the exterior passenger side cab and front fender, and the front hood. Elias's fingerprints were found on the passenger side door and window, the rearview mirror, the rear sliding window, and the front hood. Elias's fingerprints were also found on a juice bottle in the truck. A red cup was found in the truck as well, and testing showed that both Chavez and Elias were major DNA contributors to samples recovered from the cup. Chavez's DNA was also recovered from a bloody bandage in the truck

DISCUSSION

I

A

Chavez and Elias contend that the evidence is insufficient to support their convictions. "The applicable standard of review is well settled: '"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt."' [Citations.] '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding

12

does not warrant a reversal of the judgment."'" [Citations.] The standard of review is the same when the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

"In resolving claims involving the sufficiency of evidence, a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 34.) "[T]he relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt . . . ." (*People v. Perez* (1992) 2 Cal.4th 1117, 1127 (*Perez*).)

When conducting this review, "[t]he appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 (*Kraft*).) However, mere speculation or conjecture is insufficient to create a reasonable inference or support a finding of fact. (*People v. Marshall*, *supra*, 15 Cal.4th at p. 35.) Evidence that gives rise only to a suspicion of guilt is likewise insufficient. (*Ibid.*)

At trial, the prosecution argued that Chavez and Elias were guilty of first degree murder through either (1) aiding and abetting the deliberate, premeditated murders of Combs and Ellis or (2) aiding and abetting a robbery that resulted in their deaths. We will affirm the convictions if either of the prosecution's theories are supported by the evidence. (See *People v. Seaton* (2001) 26 Cal.4th 598, 645 ["when a prosecutor argues two theories to the jury, one of which is factually sufficient and one of which is not, the conviction need not be reversed, because the reviewing court must assume that the jury

13

based its conviction on the theory supported by the evidence"].)  Because we conclude that the evidence supports the convictions under the latter theory, we need not consider the former.  (*Ibid*.)

"All murder . . . which is committed in the perpetration of, or attempt to perpetrate, . . . robbery . . . is murder of the first degree."  (§ 189; see *People v. Thompson* (2010) 49 Cal.4th 79, 115 ["One who unlawfully kills a human being during the commission of a robbery or an attempted robbery is guilty of first degree murder under the felony-murder rule."].)  Liability for first degree murder under the felony-murder rule extends to both the actual killer and, under certain circumstances, his accomplices.  "Our cases establishing the complicity of a nonkiller in a felony murder have . . . uniformly required, at a minimum, that the accomplice have been, at the time of the killing, a conspirator or aider and abettor in the felony."  (*People v. Pulido* (1997) 15 Cal.4th 713, 723 (*Pulido*).)  "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'"  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)  As our Supreme Court has explained, "[t]he aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own.  It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role."  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120.)

"A person may aid and abet a criminal offense without having agreed to do so prior to the act.  [Citations.]  In fact, it is not necessary that the primary actor expressly

14

communicate his criminal purpose to the defendant since that purpose may be apparent from the circumstances. [Citations.] Aiding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531-532.)

B

Chavez contends that substantial evidence does not support his conviction under the felony-murder theory because there is no evidence showing that Chavez participated in the robbery before Combs and Ellis were murdered.[5] The felony-murder rule will not apply "even where a cofelon committed the killing during a robbery, if the nonkiller did not join the felony until *after* the killing occurred." (*People v. Cavitt* (2004) 33 Cal.4th 187, 200.) Here, however, the evidence supports a finding that Chavez was a participant in the robbery prior to the murders of Combs and Ellis. Three witnesses identified Chavez at the Anchors and Spurs bonfires prior to the killings. Chavez, accompanied by several other males, acted in an aggressive and discomforting manner towards the partygoers in the early morning hours before the robbery and murders. Chavez and his companions were still there when all of the partygoers except Combs and Ellis had left. When one partygoer tried to return to the bonfire to retrieve her jacket, Chavez made sexual remarks to her and scared her off. When Combs and Ellis were alone with Chavez and his companions, they were robbed and murdered. Chavez himself went through

---

[5] In his opening brief, Chavez argued that substantial evidence did not support his conviction under the theory that he was liable for the murders of Combs and Ellis because they were the natural and probable consequences of the theft of Ellis's truck. As discussed in part III, *post*, the prosecution did not argue this theory at trial. On reply, Chavez acknowledges that the Attorney General is not pursuing this theory on appeal. We therefore need not address it.

15

Combs's pants pockets and took possession of Ellis's truck, which Chavez still had four days later. This evidence supports a finding that Chavez was part of the robbery from the beginning. (See *People v. Hodgson* (2003) 111 Cal.App.4th 566, 576 (*Hodgson*) ["The direct evidence of the defendant's nonparticipation until after the killing in *Pulido* distinguishes that case factually from the present case."].)

Chavez's conviction was not based on speculation, as Chavez contends. (See, e.g., *People v. Holt* (1997) 15 Cal.4th 619, 669 ["An inference is not reasonable if it is based only on speculation."]; *People v. Lewis* (1963) 222 Cal.App.2d 136, 149 ["A conviction based on . . . pure speculation and guess-work cannot stand."].) The finding that Chavez aided and abetted the robbery of Combs and Ellis is the rational product of reason applied to the ample evidence tying Chavez to the scene of the crime, the body of Combs, and the fruits of the robbery itself. The murders of Combs and Ellis were logically and temporally related to the underlying robbery, and the evidence supports a finding that their killings aided the robbery by subduing Combs and Ellis so that Chavez and his companions could steal their wallets, Ellis's truck, and whatever else of value they could find. (See *People v. Cavitt*, *supra*, 33 Cal.4th at p. 196.) Substantial evidence therefore supports Chavez's convictions.

C

Elias likewise contends there is insufficient evidence to support his conviction. Elias argues that the cigarette butt found at the scene and the forensic evidence recovered from Ellis's truck do not lead to the reasonable inference that Elias aided and abetted the robbery. Elias's argument relies, in large part, on a misstatement of the applicable standard of review. Elias argues that his convictions cannot stand if the evidence is as

16

consistent with guilt as with another rational conclusion that points to innocence. (See *People v. Flores* (1943) 58 Cal.App.2d 764, 769 ["it is elementary law that circumstances relied upon to establish the guilt of one accused of crime must be consistent with that hypothesis and inconsistent with any other rational conclusion"].) However, this principle is not a correct statement of law to be applied on appeal. "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" (*People v. Jones* (2013) 57 Cal.4th 899, 961.) "Nor may a conviction be set aside because evidence is susceptible of two reasonable inferences, one looking to guilt and another to innocence." (*People v. Lewis*, *supra*, 222 Cal.App.2d at p. 149.)

Viewing the entire record in the light most favorable to the prosecution, and drawing all reasonable inferences from the evidence in support of the conviction, as we must, we conclude substantial evidence supports Elias's convictions. Our Supreme Court's opinion in *People v. Bean* (1988) 46 Cal.3d 919 (*Bean*) is instructive. In that case, the defendant challenged the sufficiency of the evidence supporting his convictions for two discrete murders. The evidence tying the defendant to one of the murders bears some similarity to the evidence here: "A pair of sunglasses bearing what the People's experts identified as defendant's fingerprints was found next to the body of Eileen Fox, and the defendant admitted owning a pair of similar sunglasses. In addition there was

17

evidence that defendant had been seen, possibly observing the house, in the past; that he was living nearby with his sister; and that he was familiar with the shortcut from the location at which the automobile, purse, and wallet were discarded to the Florin Meadows apartments." (*Id.* at pp. 933-934, fns. omitted.)

With other evidence of the victim's condition, the Supreme Court found sufficient evidence to support the defendant's first degree murder conviction and "the jury's conclusion that the murder was committed in the perpetration of a burglary and a robbery." (*Bean*, *supra*, 46 Cal.3d at p. 934.)

The evidentiary similarity between *Bean* and the instant case supports the conclusion Elias participated in the killings and robbery. Here, just as in *Bean*, forensic evidence on a small, portable object places Elias at the scene of the crime. (See *Bean*, *supra*, 46 Cal.3d at p. 933.) While Elias was not specifically identified by any witness as one of Chavez's companions that night, it is reasonable to infer that he was there based on the cigarette butt and the forensic evidence recovered from Ellis's truck. Elias's fingerprints were recovered from multiple interior and exterior surfaces on the truck, as were Chavez's, and DNA from both Chavez and Elias was recovered from the same cup inside the truck. Elias claims that no evidence of the relationship between Chavez and Elias was introduced, but the forensic evidence recovered from the truck demonstrates that they were known to each other. Moreover, the evidence tying Elias to the fruits of the robbery is arguably stronger than the evidence considered sufficient in *Bean.* Elias's fingerprints and DNA were recovered from Ellis's truck, whereas the evidence in *Bean* showed only that the defendant was familiar with a route near where certain stolen goods were discarded. (See *Id.* at p. 934.) Elias's attempt to distinguish *Bean* on the facts is

18

unpersuasive, as the evidence here is in fact more incriminating than the evidence considered by the Supreme Court in *Bean*.

Although the jury convicted the defendant in *Bean* of first degree murder as the perpetrator of the robbery and murder, the reasonable inferences drawn in that case from the evidence apply equally to the aiding and abetting theory of liability pursued by the prosecution here. Indeed, the purpose of aiding and abetting liability is to "obviate[] the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1120; see *People v. Morante* (1999) 20 Cal.4th 403, 433 ["the doctrine . . . '"snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does not personally engage in all of the elements of the crime"'"].)

"Factors relevant to a determination of whether defendant was guilty of aiding and abetting include: presence at the scene of the crime, companionship, and conduct before and after the offense." (*People v. Singleton* (1987) 196 Cal.App.3d 488, 492.) Considering these factors, and viewed as a whole, the evidence points to Elias's complicity and supports his conviction. Although Elias contends there is "no evidence" of his actions or intent that night, it is reasonable to infer that Elias was present with Chavez at the Anchors and Spurs bonfires prior to the robbery and murders, that he waited with Chavez until Combs and Ellis were alone, that he assisted Chavez and potentially others in robbing and murdering Combs and Ellis (or was the perpetrator himself), and that he then left the scene with Chavez in Ellis's stolen truck. These inferences arise out of the consistent testimony of witnesses that Chavez was present at

19

the bonfires with one or more companions, separate DNA recovered at the crime scene which showed that Chavez and Elias had been present, and the DNA and fingerprints found in Ellis's truck, which showed that both defendants were occupants of the truck.

Elias's culpability is reinforced by a large quantum of evidence which shows that at least two perpetrators were needed to accomplish the robbery and double murder. Witnesses testified that Ellis parked his truck with its rear facing the bonfire, where his body and Combs's body were later found. Although the bodies of Ellis and Combs were 16 feet apart, their location, their parallel positioning and the location of the items removed from the truck and dumped on the ground support the conclusion that Ellis and Combs were killed on either side of the truck. Combs's body was found on what would have been the passenger side of Ellis's new truck; Ellis's body, parallel to Combs's body, was found on what would have been the driver's side of the truck, the same side where the accessory items from the truck and the brochure were found after being removed from the truck and dropped on the ground. The condition of Ellis's body supports an inference he had been in a fight before he was killed. His face and neck area had contusions. His leg had been injured. His clothing was uncharacteristically disheveled, and there was plant debris on his face. Given the distance between the bodies, the likelihood the truck was between them and the fact one of the victims engaged in a physical fight before being killed, it is difficult to conclude that only one person was able to subdue, fight and kill both victims.

Although a mere spectator may not be liable for aiding and abetting, and mere knowledge of a perpetrator's unlawful purpose is insufficient, in light of all the circumstantial evidence in the record, Elias's contention that his role might have been so

20

limited is speculation. (See *People v. Nguyen*, *supra*, 21 Cal.App.4th at pp. 529-530.) As the court in *People v. Allen* (1985) 165 Cal.App.3d 616 stated on an analogous record: "Under these circumstances, it is immaterial that the evidence was silent as to which defendant actually shot [the victim]; it is virtually inconceivable that the one who did *not* shoot him did not aid and abet the shooting." (*Id*. at p. 626.)

Elias contends that this case is similar to *People v. Trevino* (1985) 39 Cal.3d 667, in which the Supreme Court concluded the evidence was insufficient to support a defendant's conviction of first degree murder. We disagree. In that case, an eyewitness offered potentially exculpatory testimony tending to show that the defendant was not one of the individuals she had seen at the scene of the crime. (*Id.* at p. 696.) Although the defendant's fingerprint was found in the house where the robbery and murder occurred, the defendant had been a guest there in the past. (*Id.* at p. 697.) The Supreme Court explained, "The highly speculative and equivocal identification testimony and the solitary fingerprint of some unknown vintage do not constitute evidence which is 'reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*Ibid.*) Here, the evidence tying Elias to the crime is more robust, including, in particular, the recently smoked Marlborough cigarette butt found between the victims' bodies very shortly after they were killed and powerful evidence of Elias's presence with Chavez in Ellis's stolen truck. Importantly, unlike the record in *People v. Trevino*, here there is no arguably exculpatory evidence in the record.

We likewise conclude that the evidence in the record here is more compelling than the evidence found insufficient in the various authorities cited by Elias in his briefing.

21

(See *People v. Flores*, *supra*, 58 Cal.App.2d at pp. 766-768 [evidence consisted of defendant's fingerprint on rearview mirror of stolen car]; *Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 938 [evidence consisted of defendant's fingerprint on cigarette lighter in rental van used in robbery].)  Substantial evidence supports Elias's convictions.

II

A

Chavez and Elias further contend that the evidence is insufficient to support the jury's special circumstances findings of multiple murders and robbery-murder.  (§ 190.2, subd. (a)(3) & (17).)  We review the sufficiency of the evidence supporting the jury's special circumstances findings in the same manner as the evidence supporting a conviction.  ""In reviewing the sufficiency of evidence for a special circumstance"--as for a conviction--"the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt."'  [Citations.]  'In a case, such as the present one, [where the finding is] based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment.  [Citation.]'  [Citation.]"  (*People v. Cain* (1995) 10 Cal.4th 1, 39 (*Cain*).)

22

"[A] finding of guilt of two murders, at least one of which is first degree murder, conclusively establishes the truth of the special circumstance for the actual killer . . . . (§ 190.2, subd. (a)(3).)  As to the aider and abettor who did not actually kill the victims, however, the special circumstance requires an additional finding that he harbored an intent to kill.  (§ 190.2, subd. (c).)"  (*People v. Souza* (2012) 54 Cal.4th 90, 110, fn. 6; see also *People v. Anderson* (1987) 43 Cal.3d 1104, 1150 ["when the defendant is an aider and abetter rather than the actual killer, intent must be proved"].)

Here, substantial evidence supports the jury's finding that Chavez and Elias intended to kill Combs and Ellis.  Chavez and Elias went to an isolated location, either armed themselves or with armed accomplices, and waited for Combs and Ellis to be left alone as the Anchors and Spurs party wound down.  Combs and Ellis were young Navy men who were capable of resisting robbery by a group of teenagers.  It is reasonable to infer that Chavez and Elias knew that their group was armed and that they intended to use deadly force against Combs and Ellis in order to rob them.  Once Chavez and Elias confronted Combs and Ellis, it is likely that Chavez and Elias were concerned that Combs and Ellis would identify them and either killed the victims themselves or intended for their accomplices to do so.  "In light of this evidence, a rational jury could conclude

---

6    Although in order to subject defendants to a sentence of life without possibility of parole we need only sustain one of the jury's special circumstances findings, we consider both of them.  We do so because we recognize that defendants' convictions are subject to further review both in our state courts and in federal court.  Our review of both findings will assist those courts in making an appropriate disposition in the event they disagree with our analysis of one special circumstance finding but not the other.

beyond a reasonable doubt defendant[s] intended to kill the victims in order to prevent them from identifying [them]." (See *Cain*, *supra*, 10 Cal.4th at p. 40.)

Moreover, the location and condition of the bodies, including the fresh abrasion found on Ellis, provide a reasonable basis to infer that Chavez, Elias, and their accomplices collectively restrained and subdued Combs and Ellis in order to kill them. When a witness returned to the bonfire to retrieve her jacket and interrupted them, either shortly before or after they killed Combs and Ellis, Chavez made sexual remarks to the witness and scared her off. After the killings, Chavez went through Combs's pockets for valuables, someone turned Ellis's body over, and Chavez (likely with Elias) drove away in Ellis's truck. Viewing the record as a whole, we conclude that substantial evidence supports the jury's finding that Chavez and Elias intended to kill Combs and Ellis.

Elias argues that "[t]here was no evidence of planning, no evidence that the participants knew the shooter was armed, and no evidence of what occurred during the shooting or what Elias did during the shooting." However, "'[c]ircumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' [Citation.]" (*Bean*, *supra*, 46 Cal.3d at p. 933.) On appeal, we "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Kraft*, *supra*, 23 Cal.4th at p. 1053.) We do not examine the record for direct evidence on specific issues. Rather, we consider whether the evidence as a whole would be sufficient for a reasonable jury to find intent to kill beyond a reasonable doubt. "Even if we might have made contrary factual findings or drawn different inferences, we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury. It is the jury, not the appellate

24

court, that must be convinced beyond a reasonable doubt. Our task and responsibility is to determine whether that finding is supported by substantial evidence." (*Perez*, *supra*, 2 Cal.4th at p. 1126.) Here, as we have discussed, we conclude that the jury's finding is supported by substantial evidence.

Chavez's argument relies on extensive quotations from the prosecution's closing argument. Chavez contends that the prosecutor's theory of intent was speculative and unsupported. "It is elementary, however, that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*Perez*, *supra*, 2 Cal.4th at p. 1126.) Regardless of the prosecution's stated theory of intent in closing arguments, we conclude that the evidence supports the jury's finding of intent to kill here.

The jury's inference that Chavez and Elias intended to kill Combs and Ellis, where the evidence shows that Chavez and Elias waited for Combs and Ellis to be alone, confronted them in an armed group in the early morning hours at an isolated location, and overpowered them in circumstances showing that multiple individuals were involved, resulting in their violent and brutal deaths, is based on neither speculation nor guesswork. It is the rational product of reason applied to the direct forensic and eyewitness evidence admitted by the trial court. Substantial evidence supports the jury's multiple murder finding.

C

"In order to support a finding of special circumstances murder, based on murder committed in the course of robbery, against an aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with

25

reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds. (c), (d).)" (*People v. Proby* (1998) 60 Cal.App.4th 922, 927, fn. omitted (*Proby*).) Because a finding of intent to kill is sufficient to support this special circumstance, our conclusion that the evidence supports such an intent in the preceding section applies here as well. In the alternative, we conclude that the evidence supports a finding that Chavez and Elias acted with reckless indifference to human life while acting as major participants in the underlying felony, robbery.

"'[R]eckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." (*People v. Estrada* (1995) 11 Cal.4th 568, 577.) Evidence tending to support a finding of reckless indifference includes choosing to flee the scene of the crime rather than assisting the victim or calling for aid. (*People v. Smith* (2005) 135 Cal.App.4th 914, 927 [defendant "chose to flee rather than going to [victim's] aid or summoning help"]; *Proby*, *supra*, 60 Cal.App.4th at p. 930 ["defendant made no attempt to assist the victim who was shot but just went on looting the safe and left the premises"]; *Hodgson*, *supra*, 111 Cal.App.4th at p. 580.) Knowledge that a defendant's accomplices are armed likewise tends to support a finding of reckless indifference. (See *Hodgson*, at p. 580 ["Appellant had to be aware use of a gun to effect the robbery presented a grave risk of death."]; see also *People v. Mora* (1995) 39 Cal.App.4th 607, 617.)

Based on the evidence, and reasonable inferences drawn therefrom, a rational jury could conclude beyond a reasonable doubt that Chavez and Elias knew that they or their accomplices were armed when they confronted Combs and Ellis in order to rob them. The evidence further shows that, following the murders, neither Chavez nor Elias came to

26

the aid of the victims or interrupted their robbery to render assistance. Substantial evidence therefore supports the jury's finding of reckless indifference.

Elias argues that the shots happened "likely in rapid succession" and, thus, Elias could not have gained an appreciation for what was happening. Elias cites no evidence in support of his assertion, and we are not aware of any support in the record. Moreover, even if the killings happened quickly, such a fact does not preclude a finding of reckless indifference based on other circumstances. Elias further argues that there is "no evidence" of his actions during the robbery. However, as explained in more detail *ante*, we find this argument unpersuasive because our standard of review mandates that we look beyond the direct evidence to circumstantial evidence, as well as all reasonable inferences that can be drawn from the evidence in support of the jury's finding. (*Cain*, *supra*, 10 Cal.4th at p. 39; *Kraft*, *supra*, 23 Cal.4th at p. 1053.)

As to the second prong, a """major participant""" includes one of a small group of accomplices acting in concert. (*People v. Smith*, *supra*, 135 Cal.App.4th at p. 928; *Hodgson*, *supra*, 111 Cal.App.4th at pp. 579-580.) Here, it was reasonable for the jury to infer that Chavez and Elias were part of a small group that robbed and murdered Combs and Ellis and, thus, "major participant[s]," based on the eyewitness accounts of Chavez and his companions that night. (*Hodgson*, at pp. 579-580.) Chavez and Elias also benefited more notably than others because they enjoyed the use of Ellis's truck. (See *Proby*, *supra*, 60 Cal.App.4th at p. 931 ["the common meaning of 'major' also includes 'notable or conspicuous in effect or scope'"].) Substantial evidence supports the jury's finding that Chavez and Elias were major participants in the robbery.

27

## III

In his opening brief, Chavez contends that the trial court erred by not instructing the jury on an additional theory of aiding and abetting liability, the natural and probable consequences doctrine, with CALCRIM No. 403. Chavez's argument appears to be based on a misapprehension of the prosecution's theories at trial, which did not include liability under the natural and probable consequences doctrine. Instead, the prosecution argued that Chavez and Ellis were liable for first degree murder either as aiders and abettors of the deliberate and premeditated murder of Combs and Ellis or as aiders and abettors of a robbery, during which Combs and Ellis were murdered.

Chavez did not request an instruction on the natural and probable consequences doctrine at trial. "[I]nstructional errors, however, are reviewable on appeal to the extent they 'affect[] [a defendant's] substantial rights.' [Citations.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 247.) Chavez does not explain how his substantial rights could be affected by the court's failure to instruct the jury on an additional, alternative theory of culpability. The jury here convicted Chavez of first degree murder based on the two theories unambiguously presented: premeditated murder and felony murder. Even if we accept Chavez's assumption that a natural and probable theory had been advanced, instructing the jury on an additional theory by which Chavez could be convicted of first degree murder would not have affected those convictions. In any event, even if Chavez had not forfeited this claim of error, any alleged error was harmless because there was no reasonable likelihood that the jury would have reached a different result had they been presented with an additional, alternative theory of first degree murder culpability. (See *Id.* at p. 249.)

28

IV

Chavez and Elias contend that the trial court erred in instructing the jury with a modified version of CALCRIM No. 376, over their objection, as follows: "If you conclude that the defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant of Murder based on those facts alone. However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed Murder.

"The supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of Murder.

"Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

Chavez and Elias argue that it was error for the court to refer to "murder" in this instruction because the legal principle embodied by CALCRIM No. 376 applies only to theft-based offenses such as robbery, burglary, or receiving stolen property. (See *People v. McFarland* (1962) 58 Cal.2d 748, 755.) In *People v. Barker* (2001) 91 Cal.App.4th 1166, this court held that it was error to include the crime of murder in the prior pattern jury instruction based on this principle (CALJIC No. 2.15) because the same natural and logical inferences that link the possession of stolen property with theft-based offenses do not apply in the same way to the crime of murder. (*Barker*, at pp. 1175-1176; see *People*

29

*v. Prieto*, *supra*, 30 Cal.4th at pp. 248, 249 ["We find *Barker* persuasive and hold that the trial court's application of CALJIC No. 2.15 to nontheft offenses like rape or murder was improper."].) The Attorney General concedes that the trial court here erred.

The issue presented is thus whether the trial court's error was prejudicial. An instructional error is prejudicial if, "'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Gamache* (2010) 48 Cal.4th 347, 376 [holding that *Watson* applies to analogous instructional error].) "The *Watson* standard provides that an error is harmless unless the appellant shows it is reasonably probable a result more favorable to the appellant would have been reached had the error not occurred." (*People v. Harden* (2003) 110 Cal.App.4th 848, 859.)

Here, Chavez and Elias argue that instructing the jury with the modified version of CALCRIM No. 376 lowered the prosecution's burden of proof and provided an improper evidentiary pinpoint instruction that was prejudicial given the evidence presented at trial. Elias further argues that this instruction was prejudicial because his possession of stolen property was allegedly unclear.

In view of the totality of the instructions provided, we disagree with Chavez and Elias's contention that the instruction's reference to "slight corroborating evidence" lowered the prosecution's burden of proof. As given, the instruction itself contained the following admonition directly after its reference to "slight corroborating evidence": "Remember that you may not convict the defendant of any crime unless you are

30

convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt." Any confusion the jury may have had was resolved promptly by that clear and express statement of the prosecution's burden in the instruction itself. Moreover, the court fully and correctly instructed the jury regarding the elements of the charged offenses and the prosecution's burden of proof in other instructions. Even without the express admonition at the close of CALCRIM No. 376, those instructions alone were sufficient to ensure that the jury would not misapply the burden of proof in this case. (*People v. Barker*, *supra*, 91 Cal.App.4th at p. 1177 ["we can find no possibility such instruction [i.e., CALJIC No. 2.15] suggested that the jury need not find all the statutory elements of murder had been proven beyond a reasonable doubt"]; *People v. Gamache*, *supra*, 48 Cal.4th at p. 376.)

The instruction's specific reference to possession of stolen property, and the inferences that "may" be drawn therefrom, also was not prejudicial error. Additional instructions provided the jury with the appropriate weight to be placed on circumstantial evidence, the scope and effect of permissible inferences from the evidence, and the responsibility of the jury to weigh the evidence independently. We find it unlikely that the jury ignored these additional instructions in favor of the modified version of CALCRIM No. 376 given here.[7] CALCRIM No. 376 instructs the jury that they "may" find certain evidence sufficient to find a defendant guilty. It does not contradict the

---

[7] Chavez argues that prejudice is shown by the prosecutor's reference to stolen property in her closing argument. However, the prosecutor's statement ("Recent possession of stolen property is a circumstance you can and should consider in finding the facts of this case") is vague and does not emphasize any of the features of CALCRIM No. 376 to which Chavez and Elias object.

31

additional instructions that place bounds on the jury's consideration of evidence. Chavez's reliance on authority where a court gave expressly inconsistent or erroneously mandatory instructions is therefore unpersuasive. (See *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 878; *Francis v. Franklin* (1985) 471 U.S. 307, 322.)

We likewise find unpersuasive Elias's argument that the court's use of CALCRIM No. 376 was prejudicial because the evidence of his "possession" of the truck was uncertain. In *People v. Rubio* (1977) 71 Cal.App.3d 757, the court held that when a defendant's possession of stolen property was "an open question," CALJIC No. 2.15 should not be used because it "assumed that the evidence established, without dispute, defendant's possession of stolen property." (*Rubio*, at p. 768.) At the time, however, CALJIC No. 2.15 was materially different than the instruction given here. CALJIC No. 2.15 stated, "'The mere fact that a person was in conscious possession of recently stolen property is not enough to justify his conviction of the crime charged . . . .'" (*Rubio*, at p. 767.) By contrast, CALCRIM No. 376 phrases the predicate findings conditionally and emphasizes the jury's responsibility for any such findings: "*If you conclude* that the defendant knew [he] possessed property and *you conclude* that the property had in fact been recently [stolen] . . . ." (Italics added.) The concerns expressed in *Rubio* and, later, in *People v. Morris* (1988) 46 Cal.3d 1, 40-41, thus have no application to the instruction at issue here.

In light of the substantial circumstantial evidence admitted at trial tending to prove Chavez and Elias's guilt, the forensic evidence tying Chavez and Elias to the crime scene and the victims, and the foregoing discussion of the potential effects of the trial court's erroneous use of CALCRIM No. 376 here, we conclude it is not reasonably probable that

32

a result more favorable to Chavez and Elias would have been reached in the absence of this instructional error. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Although the court's application of CALCRIM No. 376 to the crime of murder was error, as the Attorney General concedes, the error was harmless in this case.

V

Elias contends that the prosecutor committed prejudicial misconduct during closing arguments. The prejudicial misconduct alleged by Elias falls into four categories: (1) arguing facts not in evidence; (2) appealing to the sympathy of the jury; (3) expressing an improper personal belief in defendants' guilt; and (4) disparaging defendants' expert witness. We address each category in turn.

A

"[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." (*People v. Kirkes* (1952) 39 Cal.2d 719, 724.) "Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct." (*People v. Hill* (1998) 17 Cal.4th 800, 823.)

The first series of alleged misstatements identified by Elias reflect the prosecutor's argument that Ellis was shot after Combs, that Ellis tried to escape, and that Ellis fought with multiple perpetrators and was restrained. Elias points out correctly that there was no direct evidence or expert testimony regarding the sequence of shots or signs of struggle. The scope of permissible argument, however, is broader. "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or

33

deductions to be drawn therefrom. [Citations.]'" (*People v. Wharton* (1991) 53 Cal.3d 522, 567.) The prosecutor's comments in this instance were reasonable inferences from the evidence admitted. Ellis had several abrasions on his neck and leg, one of which was fresh. His belt was undone, and his clothes were uncharacteristically disheveled. From these facts, the prosecutor could reasonably infer that Ellis had been involved in a struggle, tried to flee, and was restrained. Finally, eyewitnesses testified that up to four people were with Chavez that night, so it is reasonable to infer that they were also involved in the robbery and murder. Though Elias argues that other inferences are also possible, the prosecution may argue its own interpretation of the evidence so long as it is reasonable. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)

The second series of alleged misstatements identified by Elias reflect the prosecutor's argument that Elias planned the robbery and that Elias was armed. Again, we find no misconduct. The evidence showed that Chavez and his group were at the Palms for some time prior to the robbery. While there was no direct evidence of a plan, the presence of Chavez and his group at the bonfires prior to the robbery, the fact that their group was armed, and the robbery itself give rise to the reasonable inference that the robbery was planned rather than occurring spontaneously. While Elias contends that the prosecution claimed he was personally armed, the prosecutor's argument was that "they took a loaded gun with them" to the Palms area. She did not specifically identify Elias. Since Combs and Ellis were shot, and all reasonable inferences point to a group consisting of at least Chavez and Elias as the shooter or shooters, the prosecutor's statement was a proper comment on the record. (*People v. Wharton*, *supra*, 53 Cal.3d at p. 567.)

34

We can discern no misconduct in the alleged misstatements identified by Elias. In light of our conclusion, we need not consider whether Elias forfeited his claims of error on appeal by failing to object or whether Elias's counsel was ineffective by failing to make such objection.

B

In her closing argument, the prosecutor described Combs and Ellis as "young men who had come to San Diego to serve their country." She also referred to Ellis's college pamphlet, arguing that "that's the kind of guy he [was], trying to better himself, serve his country -- [¶] . . . [¶] -- go to college." The trial court overruled defense counsel's objection to the latter comment. No objection was made to the former. Elias contends on appeal that the prosecutor's statement that Ellis and Combs "serve[d] their country" when they were killed was an improper appeal to the jury's sympathy. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1130.) In *Kipp*, the prosecutor argued to the jury, during the guilt phase of a capital trial, that the jury should "'think for a moment about what [murder] means. A living, breathing human being had all of that taken away.'" (*Id.* at p. 1129.) The court held that "[t]he prosecutor's argument, inviting the jury to reflect on all that the victim had lost through her death, was an appeal for sympathy for the victim, and therefore it was improper . . . ." (*Id.* at p. 1130.)

Here, the prosecutor's statement that Combs and Ellis "serve[d] their country" does not invite such an emotional response from the jury. A prosecutor is not "required to discuss his view of the case in clinical or detached detail." (*People v. Panah* (2005) 35 Cal.4th 395, 463.) Such a mild comment on the victims' military service, which was

relevant to a number of issues in the case, does not improperly appeal to the jury's sympathy and was not misconduct.

C

The prosecutor also argued, in closing, that "[n]obody was there to witness it. The witnesses are dead. But just as my heart is beating in my chest, those two men stopped the heartbeats of Keith and Cliff." Defense counsel did not object to the prosecutor's statement. Elias argues on appeal that the prosecutor expressed an improper personal belief in Chavez's and Elias's guilt.

"A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial." (*People v. Mincey* (1992) 2 Cal.4th 408, 447.) "The general rule is that improper vouching for the strength of the prosecution's case '"involves an attempt to bolster a witness by reference to facts outside the record."' [Citation.] Thus, it is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. [Citations.] Specifically, a prosecutor's reference to his or her own experience, comparing a defendant's case negatively to others the prosecutor knows about or has tried, is improper. [Citation.] Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record. [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 206-207.)

Elias argues that the context of the prosecutor's statement, made after the prosecutor presented her theory of how the crime occurred, created a substantial risk that

36

the jury interpreted the statement as being based on facts outside the record. We disagree. While the prosecutor did vouch for her case, neither the content nor the context of the prosecutor's statement indicated to the jury that her belief in Chavez's and Elias's guilt was based on anything other than the facts admitted in evidence. The prosecutor repeatedly referenced the facts and evidence in the record during her closing argument and argued the prosecution's view of the reasonable inferences to be drawn therefrom. We discern no error or misconduct under these circumstances. Again, in light of our conclusion, we need not address issues of forfeiture or ineffective assistance of counsel.

D

The prosecutor addressed the defense expert witness, Lisa Dimeo, in closing argument as follows: "And I have to comment on the expert. How can I not? You can hire somebody and have them come in here and say anything." Defense counsel objected but was overruled. Elias contends that the prosecutor's comments improperly implied that defense counsel or the expert improperly fabricated evidence.

"[C]ounsel is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 162.) However, "[i]t is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. [Citations.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

37

Although we are reluctant to definitively declare error, given the mild and fleeting nature of the prosecutor's remark, it is possible that a juror could reasonably interpret the statement "[y]ou can hire somebody and have them come in here and say anything" as an implicit attack on the credibility of counsel, who hired the expert, rather than a critique based on the evidence. If it was error, however, it was harmless given the nature of the remark, the context in the prosecution's closing statement, the relative unimportance of the defense expert's testimony (see fn. 3, *ante*), and the substantial evidence of Chavez and Elias's guilt introduced at trial. It is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

## VI

As we have noted, the trial court sentenced Chavez and Elias each to two consecutive terms of life imprisonment, without possibility of parole, plus an additional consecutive year. The trial court initially sentenced Chavez and Elias to life without possibility of parole because it erroneously believed it had no other sentencing options. When advised by the prosecutor that it had discretion to sentence defendants to terms of 25 to life under section 190.5, subdivision (b), the trial court conducted a further hearing and provided defendants an opportunity to argue and present evidence of mitigating circumstances. At the conclusion of the second sentencing hearing, the court declined to modify defendants' sentences.[8]

---

[8] In declining to modify its imposition of consecutive life terms without the possibility of parole, the trial court stated: "This is not an easy one, folks. Judges frequently think we need more discretion in the law. Then sometimes having discretion makes this job a lot more difficult.

Relying on *Miller* and *Gutierrez*, Chavez and Elias argue that because they were both juveniles at the time of the murders, the trial court erred in imposing life sentences without the possibility of parole and their cases should be reversed and remanded for resentencing.  We agree that *Gutierrez* requires defendants' sentences be reversed and

"I said at the [initial] sentencing I'd be hard-pressed to come up with a more callous murder than what these two gentlemen engaged in.  To take the life of two young navy men at the prime of their life, fighting with distinction for their country, and to annihilate them execution-style, right through the head, over a truck is about as low as it gets, folks.  And I know the family members back there love these two gentlemen, but on the date in question, they couldn't have treated a dog worse than they treated these two young men, and that's a fact.  I mean, I have seen hundreds of murders, and this was as callous as you get.

"These defendants had juvenile offenses.  This was a classic gang record.  Juvenile offenses, repeated juvenile violations prior to this offense.  They get away with this crime when it occurs.  Do they change their lives?  Do they get out and decide, 'Okay, now I'm going to make something out of my life'?  Both of these defendants had adult felony offenses, Mr. Chavez for robbery, Mr. Elias for attempted robbery, as well as other offenses, and parole violations.  So [the prosecutor] is correct. These are not two gentlemen who had one terrible night and then led a crime-free life after that.

"The flip side is, these two gentlemen have family members and community support that is rare for this court to see, and those of you that have been in my court a lot know that with young people, I tend to try to think about second chances.  So I am telling you, I have been wrestling with this one.  I have been thinking about it a lot.

"I just think at the end of the day -- I could have lived with the juvenile record if after this execution-style double homicide these men had been crime-free, but given the violent crimes after this double homicide, it just doesn't seem right to me.  I just -- I can't justify it.  And I know there has been a hiatus recently in criminality, but I just keep thinking about these two victims and that they were killed young, a young vibrant time in their life, when they had so much of their life to look forward to.  And I keep thinking about the one victim's wife.  He was a newlywed and his life -- his wife's life is over.  I mean, we all heard her speak.  She'll never be the same mentally, physically.  That murder destroyed her existence.  And the other victim's family, the mother and father adored that young boy, and they'll never recover from it, their only son.

"So I think at the end of the day, if you look at this supplemental probation report, [the prosecutor] is right.  You just can't come up with anything in mitigation, and every single circumstance aggravates the situation.  So the court stands by my prior ruling and will decline to modify the sentence."

that the trial court must resentence them considering the views expressed in *Miller* and *Gutierrez*.

A. *Miller*

In *Miller*, the United States Supreme Court considered mandatory life sentences without the possibility of parole imposed on two 14-year-old boys who were responsible for separate murders in separate states. One of the boys, Kuntrell Jackson, was an aider and abettor in the 1999 robbery of a video store in Arkansas during which one of Jackson's two accomplices shot and killed the sales clerk at the video store. After his case was transferred to adult court, Jackson was convicted of felony murder and aggravated robbery and, under Arkansas law, the trial court sentenced him to a mandatory life sentence without the possibility of parole. His conviction and sentence were affirmed on appeal. Jackson then brought a state habeas petition in which he argued that, in light of his age at the time of the crimes, the mandatory life sentence without possibility of parole was cruel and unusual punishment. The state trial court dismissed Jackson's petition, and its dismissal was affirmed by the Arkansas Supreme Court.

In 2003, the other 14-year-old boy, Evan Miller, went to a neighbor's house in Alabama with a friend and spent the night smoking marijuana and drinking with the neighbor. Earlier in the evening, the neighbor had made a drug deal with Miller's mother. When the neighbor passed out, Miller attempted to steal the neighbor's wallet; during the attempted theft, the neighbor woke up and started choking Miller. Miller's friend hit the neighbor with baseball bat and, when the neighbor released Miller, Miller picked up the bat and beat the neighbor unconscious. Miller and his friend then set fire to the neighbor's trailer to cover up their crime. The neighbor died from his injuries and smoke

40

inhalation. Miller's case was also transferred to adult court, and he was convicted of murder in the course of arson, which, in Alabama, carries a mandatory sentence of life without the possibility of parole. On appeal, the Alabama Court of Criminal Appeals rejected Miller's argument that, considering his age at the time of the crime, the mandatory life sentence without possibility of parole was cruel and unusual.

The Supreme Court granted certiorari from the judgment dismissing Jackson's state habeas proceeding and from the judgment affirming Miller's conviction and reversed both cases for resentencing. The court found that mandatory life sentences for juveniles offended two strands of the court's sentencing jurisprudence: a group of cases which found that the severe punishments of capital punishment and mandatory life without the possibility of parole in nonhomicide cases, may not be imposed on certain classes of criminals, such as juveniles, perpetrators of nonhomicide offenses, or the mentally retarded (see, e.g., *Graham v. Florida* (2010) 560 U.S. 48, 67-75; *Kennedy v. Louisiana* (2008) 554 U.S. 407; *Atkins v. Virginia* (2002) 536 U.S. 304), because those punishments are disproportionate to the culpability of members of those classes; and a second related line of cases which require that before capital punishment or its equivalent may be imposed, sentencing authorities must consider the particular characteristics of the defendant and the details of the offense. (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at pp. 2463-2464].)

With respect to the punishment of juveniles, the court stated: "'[Y]outh is more than a chronological fact.' [Citation.] It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' [Citation.] It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.'

41

[Citation.] And its 'signature qualities' are all 'transient.'" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2467].) The court found its reasoning in *Eddings v. Oklahoma* (1982) 455 U.S. 104 "especially on point." (*Miller*, at p. ___ [132 S.Ct. at p. 2467].) "There, a 16-year-old shot a police officer point-blank and killed him. We invalidated his death sentence because the judge did not consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father's physical abuse) and his emotional disturbance. We found that evidence 'particularly relevant'--more so than it would have been in the case of an adult offender. [Citation.] We held: '[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his culpability. [Citation.]" (*Ibid.*)

Thus, the court found that mandatory life sentences without the possibility of parole were invalid: "Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other--the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. And still worse, each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at pp. 2467-2468].) In particular, the court found the mandatory character of the life sentences was disproportionate and hence invalid because it deprived the sentencing judge of the opportunity to consider: (1) the juvenile's age and its inherent impact on the juvenile's culpability; (2) the juvenile's

42

familial and social circumstances; (3) the circumstances of the homicide offense, including the extent of the juvenile's participation in the offense; (4) the impact of the juvenile's youthfulness on his ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) "the possibility of rehabilitation even when the circumstances most suggest it."  (*Miller*, at p. ___ [132 S.Ct. at p. 2468].)

In light of its longstanding views about the diminished culpability of youthful offenders and their heightened capacity for change, the court stated:  "[W]e think appropriate occasions for sentencing juveniles to the harshest possible penalty will be uncommon.  That is especially so because of the great difficulty [we have noted] of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]  Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469], fn. omitted.)

B.  *Gutierrez*

In *Gutierrez*, our Supreme Court considered two juvenile defendants who had been sentenced to life terms without the possibility of parole.  In the first case, Andrew Lawrence Moffett participated in an armed robbery.  When Moffett and his codefendant were fleeing the scene of the robbery, his codefendant shot and killed a police officer.  Moffett was 17 years old at the time of the killing, and he was found guilty of felony murder and sentenced to life without the possibility of parole.  In the second case, Luis

43

Angel Gutierrez, who was 17, was living with his aunt and uncle. Early one morning, after his uncle left for work, Gutierrez went into his aunt's bedroom, where, in the course of attempting to rape her, he stabbed her to death. Gutierrez was convicted of murder with a special circumstance finding the murder was committed during a rape or attempted rape. Gutierrez was also sentenced to life without the possibility of parole.

Like Chavez and Elias, Moffett and Gutierrez were sentenced before *Miller* was decided and under the provisions of section 190.5. Section 190.5 gives a trial court discretion to sentence a defendant who is convicted of first degree murder with special circumstances and was between the ages of 16 and 18 at the time of the subject crime to life without the possibility parole or a term of 25 years to life. At the time Moffett and Gutierrez were sentenced, section 190.5 had been repeatedly interpreted as imposing a presumptive sentence of life without the possibility of parole, subject to a determination by the trial court that there was good reason to impose the less severe sentence of 25 years to life. (See *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141-1142 (*Guinn*).)

In *Gutierrez*, the Supreme Court found that the presumption established in *Guinn* was inconsistent with the principles set forth in *Miller*. "'Treating [life without parole] as the default sentence takes the premise in *Miller* that such sentences should be rarities and turns that premise on its head, instead placing the burden on a youthful defendant to affirmatively demonstrate that he or she deserves an opportunity for parole." (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1379.) Because section 190.5 may be construed as creating no presumptive sentence, and such a construction is more consistent with *Miller*, the court overruled *Guinn* and the other cases that had adopted the presumption and held "that section 190.5(b) confers discretion on the sentencing court to impose either life

without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstances murder, with no presumption in favor of life without parole." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1387.)

The court further held that in considering whether to impose a life sentence without possibility of parole, a sentencing court must consider the five factors enumerated in *Miller*: (1) the inherent impact of the juvenile's age on his culpability; (2) the juvenile's home and family environment; (3) the circumstances of the homicide offense; (4) the juvenile's ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) the possibility of rehabilitation. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1389-1390.)

In considering disposition of both cases, the court in *Gutierrez* presumed that both sentencing courts had followed the law as interpreted by *Guinn* and its progeny and that both courts had therefore erroneously treated a sentence of life without possibility of parole as required by section 190.5, unless good reason to impose the less severe option of 25 years to life existed. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1390.) The court further found that this presumed error required a remand for resentencing because: "Although the trial courts in these cases understood that they had some discretion in sentencing, the records do not clearly indicate that they would have imposed the same sentence had they been aware of the full scope of their discretion. Because the trial courts operated under a governing presumption in favor of life without parole, we cannot say with confidence what sentence they would have imposed absent the presumption." (*Gutierrez*, at p. 1391.) In remanding both cases for resentencing, the court, reiterating *Miller*, stated: "The question is whether each can be deemed, at the time of sentencing, to be irreparably

45

corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults. [Citation.]" (*Ibid*.)

C. Analysis

Chavez and Elias were both sentenced before either *Miller* or *Gutierrez* were decided. Thus, the trial court did not conduct the analysis required by those cases and imposed sentence at a time *Guinn* compelled a presumption in favor of a life sentence without the possibility of parole.

Although the record may support the trial court's decision to impose life sentences without the possibility of parole, because at the time the sentences were imposed the trial court did not have the benefit of either *Miller* and *Gutierrez* and was bound by the invalid presumption that the life sentences without the possibility of parole should be imposed,[9] we consider the narrow question of whether the guidance provided by *Miller* and *Gutierrez* would have altered the trial court's sentencing choices.

There are circumstances in the record that suggest resentencing, even with the guidance provided by *Miller* and *Gutierrez*, will not lead the trial court to impose a more lenient sentence on either defendant: the trial court found that in first isolating Ellis and

---

[9]    The record is silent with respect to whether the trial court applied the *Guinn* presumption. As we have noted, under similar circumstances the court in *Gutierrez* applied the presumption that, unless a record otherwise indicates, a trial court knew and followed governing law. (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1390, citing *People v. Thomas* (2011) 52 Cal.4th 336. 361.) The Attorney General argues that, given the fact that the trial court was initially unaware of the express discretion provided by section 190.5, we should interpret its silence with respect to the presumption as an indication that it was also unaware of the presumption provided by *Guinn* and the cases that followed *Guinn*. We decline to do so. We see no end to the mischief that would arise were we to interpret a completely silent record as indicating that a trial did *not* follow the law.

Combs, and then, acting together, executing them, defendants were as callous a pair of murderers as she had seen in her lengthy career; although given the opportunity to present evidence in mitigation in the trial court, neither defendant provided information that might limit their culpability or show how commission of these crimes was related to their relative youthfulness and, on appeal, neither suggest that on remand they would be able to provide such mitigating evidence; and finally, the trial court, in apparently determining the murders were less the product of youth than of defendants' malevolent characters, placed a great deal of emphasis on the fact that in the years immediately following the murders, Chavez and Elias continued to lead a life of criminality. These circumstances are independent of the presumption overruled in *Gutierrez* and suggest that, on remand, the trial court, even with the benefit of *Gutierrez*, may impose the harshest possible sentence on defendants.

However, as the court's holding in *Gutierrez* makes plain, before we can affirm these severest of possible sentences for a juvenile crime, we have confidence that the trial court, fully informed of its discretion, would have imposed those sentences. (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) This leads us to the ultimate question posed by the courts in both *Miller* and *Gutierrez*, which the trial court here must answer: did these crimes reflect transient immaturity or irreparable corruption? (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469]; *Gutierrez*, at p. 1378.) As we read *Miller* and *Gutierrez*, the enumerated factors are not ends in themselves but rather are, when considered together in a reasoned manner, the useful and necessary means by which a sentencing court must determine whether transient immaturity requires some degree of leniency or irreparable corruption must be punished as severely as possible. (See *Miller*, at p. ___

47

[132 S.Ct. at p. 2469]; *Gutierrez*, at p. 1378.)  There is nothing in the record which indicates that the *trial court* itself directly considered this ultimate question.  Because the record is silent on this ultimate issue, we cannot say we are convinced as to how the trial court would exercise its discretion and, thus, we are compelled to remand for resentencing.

## VII

Chavez and Elias argue, and the Attorney General agrees, that the parole revocation fine imposed by the court under section 1202.45 should be stricken because their sentences preclude the possibility of parole.  (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 ["When there is no parole eligibility, the fine is clearly not applicable."].)  We agree as well and, on remand, the trial court is directed to modify the judgment accordingly.

## DISPOSITION

We reverse imposition of the life sentences without possibility of parole and the parole revocation fines imposed pursuant to Penal Code section 1202.45 and remand for resentencing consistent with the views we have expressed.  In all other respects, the judgments are affirmed.

BENKE, Acting P. J.

WE CONCUR:

McDONALD, J.

AARON, J.