Filed 6/9/15  P. v. Ricardez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064561 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN303431) |
| SAMUEL ORTEGA RICARDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Reversed in part and remanded with directions.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Tony DaSilva and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Samuel Ortega Ricardez of first degree murder (Pen. Code,[1] § 187) and robbery (§ 211), both with firearm (§ 12022.53, subds. (d) & (b)) and criminal street gang (§ 186.22, subd. (b)(1)) enhancements. Although Ricardez was 16 years old at the time of the offenses, the trial court sentenced Ricardez to 25 years to life for the murder conviction with a consecutive 25 years to life sentence for the gun enhancement, a consecutive five-year sentence for the robbery and consecutive 10-year terms for the gun and criminal street gang enhancements. Taken together, Ricardez was sentenced to a prison term of 75 years to life. Ricardez appeals, contending the trial court erred by failing to instruct on voluntary manslaughter as a lesser included offense of murder. Additionally, Ricardez argues that his sentence is functionally life without the possibility of parole and that, therefore, in light of his status as a juvenile at the time of the offenses, the sentence violates his constitutional rights under the Eighth Amendment to the United States Constitution.

Although we find no instructional error, we agree that his sentence is the functional equivalent of a life sentence without the possibility of parole and violates his Eighth Amendment rights.

FACTUAL BACKGROUND

On an early morning in March 2012, Ricardez, a member of a criminal street gang, and two confederates entered rival gang territory to "tag" the area with threatening graffiti.[2] Ricardez carried a weapon with him that he described as a wooden, two-piece

---

[1] All further statutory references are to the Penal Code, unless otherwise specified.

[2] Ricardez admitted to being a member of the Posole gang.

firearm similar to a rifle. Ricardez's group saw another youth, Damien B., walking around the neighborhood; Ricardez's group chased Damian and caught him. Ricardez pointed his firearm at Damien. Damien told Ricardez's group that he "wasn't banging . . . so they wouldn't shoot." Ricardez responded "Oh, you're Black," and Damien surmised that "they probably didn't think that I was a gang member because I was Black." Ricardez and his cohorts proceeded to rob Damien of his possessions, including an iPod, a baseball hat, and a necklace. They then released Damien, who went back to his nearby home and told his father what had happened.

After robbing Damien, Ricardez and his companions separated but remained in the rival gang area. Ricardez saw what he thought were rival gang members, so he hid under a vehicle. After a period of time and believing it was safe to do so, Ricardez left his hiding place and walked past a house where Antonio Perez was sitting on the porch with two of his cousins and a friend. Perez saw Ricardez and called out to him. Ricardez knew Perez, and he also knew Perez associated with rival gang members. By his own later admission to detectives, Ricardez then shot Perez with the firearm he was carrying. Perez walked towards the house and collapsed in the doorway. One of Perez's cousins chased Ricardez but lost sight of him as Ricardez ran through a nearby apartment complex. Perez's other cousin held Perez in his arms until police arrived. A medical examiner determined that Perez died due to a shotgun blast to his abdomen.

Detectives found recently painted graffiti associated with Ricardez's gang in the neighborhood near the crime scene. Because Ricardez was known as a graffiti "tagger" for his gang, detectives brought Ricardez to the police station to interview him. During the interview, Ricardez confessed that he was a gang member, that he and his

3

companions entered rival gang territory for the purpose of tagging, that he carried a firearm, and that he and his group robbed Damien at gunpoint. Ricardez also admitted that he shot Perez. In the interview, Ricardez indicated that he was holding his gun; that he heard Perez say, "What the fuck?"; and that he then turned and shot Perez. Ricardez stated he was scared and fired his gun as he turned around to face Perez: "I just turn around, and then I was, like, 'Fuck. Fuck.' Bam. That shit just shot." The jury watched a video recording of Ricardez's interview at trial.

At trial, Ricardez testified on his own behalf. While he testified that he and his group walked into the rival gang's neighborhood for the purpose of "tagging," that he carried a firearm, and that his group robbed Damien, he denied shooting Perez. Ricardez stated that he had lied to the detectives during the interview because they were lying to him. He said he claimed responsibility for shooting and killing Perez because "I wasn't paying attention" and "[b]ecause I didn't want to be there no more." The jury found Ricardez guilty of first degree murder and armed robbery, and found true the alleged firearm and gang enhancements.

## DISCUSSION

### I

### Voluntary Manslaughter

Ricardez contends the trial court should have instructed sua sponte on the lesser included offense of voluntary manslaughter because Ricardez told the interviewing detectives that he was frightened at the time he shot Perez. For a number of reasons, we disagree.

4

A. *Trial Court's Instruction Rulings*

Prior to the close of trial, the trial court conducted a conference on jury instructions. Initially, Ricardez's counsel asked the trial court to give an instruction on manslaughter as a lesser included offense of the charged crime of first degree murder. Counsel made the request after and in response to the prosecution's request for a lesser included offense instruction on second degree murder, which the trial court granted. Ricardez's counsel expressed a great deal of equivocation about her request for a manslaughter instruction and acknowledged that it was inconsistent with the defense theory that Ricardez did not shoot Perez. Counsel stated: "So the court knows the logic behind it, my theory was an all-or-nothing theory; however, since the People are asking for second, and even though I can argue that it's opposite to my theory, there is evidence that would support the second degree.

"And do I believe if they are going to have some lesser, it should be also offered the opportunity for another lesser. I am requesting that other lesser."

When the trial court inquired as to what theory supported a manslaughter instruction counsel stated:

"May I have a second? As I said, I am sort of thinking this through by virtue of what -- even though my theory is kind of the opposite." The trial court then took a break and gave defense counsel an opportunity to consider her request for a manslaughter instruction. An hour later, proceedings resumed and counsel stated: "After substantial discussion, your honor, the defense will not be requesting any lesser included offenses." The trial court responded that, in any event, it did not believe there was substantial evidence of voluntary manslaughter under either a theory of imperfect self-defense or

5

heat of passion; the trial court then asked Ricardez's counsel: "And, therefore, is it your tactical decision, then, [defense counsel], to request no lesser manslaughter instructions because you intend to argue that your client did not participate in any way in the homicide?" Ricardez's counsel responded in the affirmative.

The trial court then stated: "All right. I further find that, over your objection, I [do not have] a sua sponte duty to include manslaughter instructions, voluntary manslaughter instructions, based upon the evidence in this case because, as I said, defendant denies being at the scene."

The trial court expressly rejected the possibility Ricardez's statements to detectives at the police station would support a manslaughter conviction: "[T]he defendant indicated to the police officers that he was armed with a shotgun, participated in tagging, participated in the robbery of Damien B., that he was armed with a shotgun during the course of that robbery, and then following the robbery, the defendant crept military style along the fence bordering the patio area of the victim's complex and front patio and, when reaching an opening in the fence, the defendant pointed a shotgun through the fence.

"There is some indication that the victim or someone said, what the fuck? And the defendant admits shooting through the fence at the victim and then fleeing from the scene.

"There appears to be no evidence of -- even based upon the defendant's statement to the police, of heat of passion or imperfect self-defense where the defendant would be under his own subjective belief that he had the need to defend as the defendant was at

6

that location of his own volition and shot the gun without any indication of either imperfect self-defense or reasonable self-defense."

B. *Legal Principles*

A trial court must sua sponte instruct the jury on all lesser offenses for which there is substantial evidentiary support. (*People v. Breverman* (1998) 19 Cal.4th 142, 153-154; *People v. Birks* (1998) 19 Cal.4th 108, 112.) "Substantial evidence" is defined as "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that a lesser offense was committed. (*People v. Flannel* (1979) 25 Cal.3d 668, 684, overruled on other grounds by *In re Christian S.* (1994) 7 Cal.4th 768, 777.) Substantial evidence is evidence "sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 (*Barton*).) But the evidence will not compel a sua sponte instruction on a lesser included offense unless it is "substantial enough to merit consideration." (*People v. Flannel*, *supra*, at p. 684, fn. 12.) "[S]peculation is not evidence, less still substantial evidence." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081, overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) "The court may refuse to instruct on a lesser included offense, despite defendant's request, when there is no evidence to support that instruction." (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

A trial court is empowered and duty bound to give a lesser included offense instruction *over* a defendant's objection when there is substantial evidence of the lesser offense. (*Barton*, *supra*, 12 Cal.4th at pp. 196-198.) Thus, in *Barton*, the trial court did not err in giving a manslaughter instruction over the defendant's objection, even though,

7

as here, the defendant was pursuing an "all or nothing" strategy and the jury returned a manslaughter conviction.  (*Ibid*.)

However, when a defendant has expressly objected to a lesser included offense instruction or otherwise indicated his opposition to such instruction, *and the trial court withholds the lesser included instruction*, the defendant may not, on appeal, then argue that such an instruction should have nonetheless been given.  (See *Barton*, *supra*, 12 Cal.4th at p. 198; see also *People v. Cooper* (1991) 53 Cal.3d 771, 830-831 (*Cooper*); *People v. Prince* (2007) 40 Cal.4th 1179, 1265.)  A defendant's objection to a lesser included offense instruction, or his expression of consent or agreement that such an instruction be withheld from the jury, raises the bar of invited error.  (See *Barton*, at p. 198.)

C.  *Analysis*

1.  Invited Error

As the Attorney General points out, Ricardez's contention that a manslaughter instruction should have been given is barred by the doctrine of invited error.  Invited error will be found "'if counsel expresses a deliberate tactical purpose in suggesting, resisting, *or acceding to an instruction . . . .*' [Citation.]"  (*Cooper*, *supra*, 53 Cal.3d at p. 830, italics added.)  "'If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.' [Citation.]"  (*Ibid*.)

Here, the record is clear that, for obvious tactical reasons, Ricardez's counsel did not want the trial court to give the jury the opportunity to convict her client of voluntary manslaughter.  As counsel herself stated, a voluntary manslaughter theory was inconsistent with the defense's contention that Ricardez was not the shooter.  In this

8

context, counsel's withdrawal of the requested manslaughter instruction, for express tactical reasons, was acquiescence in the trial court's decision not to give such an instruction sufficient to raise the bar of invited error. (See *Cooper*, *supra*, 53 Cal.3d at p. 830.)

2. Substantial Evidence

Even if Ricardez had asked for a manslaughter instruction, on this record the trial court was not required to give one. As the trial court noted, Ricardez's statements to detectives were not substantial evidence that when he shot Perez he was acting out of any perceived imminent threat of serious injury or death; thus, there was no substantial evidence to support a voluntary manslaughter conviction.

Our Supreme Court has established narrow parameters for the theory of imperfect self-defense embodied in voluntary manslaughter and asserted by Ricardez on appeal: "We caution, however, that the doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. We also emphasize what should be obvious. Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. '"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" . . . [¶] This definition of imminence reflects the great value our society places on human life.' (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1187, 1189, italics added.) Put simply, the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense. [¶] We also emphasize that whether the defendant

9

actually held the required belief is to be determined by the trier of fact based on all the relevant facts.  It is not required to accept the defendant's bare assertion of such a fear. And, of course, a defendant's evidence of self-defense is subject to all the normal evidentiary rules, including Evidence Code sections 350 and 352.  Finally, we reiterate that, just as with perfect self-defense or any defense, '[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*.'  (*People v. Aris*, *supra,* 215 Cal.App.3d at p. 1192, italics added.)"  (*In re Christian S.*, *supra*, 7 Cal.4th at p. 783.)

The Supreme Court elaborated on the narrowness of self-defense in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1094:  "The law thus recognizes that the objective component is not measured by an abstract standard of reasonableness but one based on the defendant's perception of imminent harm or death.  Because his state of mind is a critical issue, he may explain his actions in light of his knowledge concerning the victim. [Citations.]  Antecedent threats as well as the victim's reputation for violence, prior 'assaults, and other circumstances [are] relevant to interpreting the attacker's behavior.' [Citations.]  While such considerations alone do not establish a right of self-defense [citation], they illuminate and reflect on the reasonableness of defendant's perception of both the imminence of danger and the need to resist with the degree of force applied. [Citation.]  They may also justify the defendant 'in acting more quickly and taking harsher measures for her own protection in the event of assault, whether actual or threatened, than would a person who had not received such threats.'  [Citation.]"

Here, Ricardez offered no evidence he was reacting to imminent danger, as opposed to a generalized fear of rival gang members.  In this regard, the trial court's

10

observations of what, according to Ricardez's own statement to detectives, he was doing in the moments before he fired his weapon, are pertinent:  Ricardez had been committing crimes in the rival gang's territory and was sneaking along a fence line with his weapon, apparently at the ready.  He then shot at the first voice he heard, which at most simply challenged his presence in the area with a gun.  On this record, no reasonable jury would find that Ricardez, even in the version of events he gave detectives, was responding to any imminent threat to his safety.

In sum, the trial court did not err when it failed to sua sponte instruct on the lesser included offense of voluntary manslaughter.

3. <u>Prejudice</u>

Finally, we note that even if an instruction on manslaughter had been requested and was required, Ricardez would not have been prejudiced by the trial court's failure to provide it.  A trial court's error in failing to provide a required instruction is governed by *People v. Watson* (1956) 46 Cal.2d 818, 836 and thus requires reversal "only if 'the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.' [Citations.]"  (*People v. Wharton* (1991) 53 Cal.3d 522, 571.)  Here, the jury's first degree murder verdict entirely eliminates the possibility of any prejudice.

In finding that when he shot Perez he was acting with premeditation, willfulness and deliberation, and not simply the intent to kill that would permit only a second degree murder verdict, the jury as a practical matter rejected the suggestion that Ricardez was acting on any impulse or fear of imminent harm.  (See *People v. Wharton*, *supra*, 53

11

Cal.3d at p. 572.)  Although theoretically, as Ricardez argues, it is possible to premediate and deliberate a killing in self-defense—where, for instance, a defendant was trapped for a period of time and had been threatened with death or serious injury—the jury was not considering such a theoretical case, and we are not charged with reviewing one.  Here, the record presented to the jury, and the one we must review, shows Ricardez was, as the trial court noted, on the prowl in a rival neighborhood and armed with a weapon he had already used to commit a robbery; in that factual context, the jury's finding that he killed with premeditation, willfulness and deliberation eliminated any possibility that the jury would have nonetheless found he acted because of any fear of imminent harm.

II

De Facto Life Without Parole Sentence

Additionally, Ricardez argues his sentence violates the Eighth Amendment to the Constitution because it is cruel and unusual to sentence a juvenile offender to a term that is functionally equivalent to life without the possibility of parole (LWOP).  He further argues that enactment of section 3051 did not remedy this defect in his sentence.  We agree that on its face a 75-year sentence imposed on a juvenile may, in the absence of an appropriate trial court record, be cruel and unusual; we also agree that enactment of section 3051 did not remedy the defect in Ricardez's sentence.

In *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*), the United States Supreme Court "found that mandatory life sentences for juveniles offended two strands of the court's sentencing jurisprudence: a group of cases which found that the severe punishments of capital punishment and mandatory life without the possibility of parole in nonhomicide cases, may not be imposed on certain

12

classes of criminals, such as juveniles, perpetrators of nonhomicide offenses, or the mentally retarded [citations], because those punishments are disproportionate to the culpability of members of those classes; and a second related line of cases which requires that before capital punishment or its equivalent may be imposed, sentencing authorities must consider the particular characteristics of the defendant and the details of the offense." (*People v. Chavez* (2014) 228 Cal.App.4th 18, 29 (*Chavez*), citing, among other cases, *Miller*, *supra*, 132 S.Ct. at pp. 2463-2464.)  Thus, the *Miller* court held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. . . .  Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 132 S.Ct. at p. 2469, fn. omitted.)

Cognizant of both the United States Supreme Court and our own Supreme Court's jurisprudence on the issue, we have held that before we can affirm these severest of possible sentences for a juvenile offense, we must have confidence that the trial court, fully informed of its discretion, determined that rather than transient immaturity that would require some degree of leniency, the juvenile's act reflected irreparable corruption that must be punished as severely as possible.  (*Chavez*, *supra*, 228 Cal.App.4th at pp. 33-34.)

As we have noted, Ricardez was 16 years old at the time he committed the subject offenses, and the trial court imposed a 75-years-to-life sentence on him.  We agree with Ricardez that this sentence is the functional equivalent of life without parole.  In the

absence of a record that reflects a determination by the trial court as to the nature of the offense, such a sentence is, on its face, cruel and unusual. (See *Chavez*, *supra*, 228 Cal.App.4th at pp. 33-34.)

Section 3051, which was enacted in 2013 and became effective on January 1, 2014, permits Ricardez to apply for parole in 25 years. Ricardez will be eligible for parole pursuant to subdivision (b)(3) of section 3051, which states: "A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions."

The Legislature enacted section 3051 specifically to comply with United States Supreme Court and California Eighth Amendment cases concerning juvenile life sentences. "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama*[, *supra*,] 183 L.Ed.2d 407." (Stats. 2013, ch. 312, § 1.) Under section 3051, "most youth offenders would be eligible for a parole hearing after a maximum of 25 years of incarceration, within the normal life expectancy of a juvenile." (*People v. Scott* (2015) 235 Cal.App.4th 397, 408.)

14

However, unlike the court in *People v. Scott*, *supra*, we do not believe section 3051 has remedied constitutional concerns of cruel and unusual punishment, when, as here, a de facto life sentence has been imposed. The Attorney General asserts that section 3051 renders moot Ricardez's cruel and unusual punishment claim because it provides a "meaningful opportunity for release on parole" during his lifetime. However, as a practical matter, at the time Ricardez becomes eligible for parole, there will be no reliable way to measure his cognitive abilities, maturity, and other youth factors at the time he committed his offense 25 years earlier. An accurate evaluation of the youth factors discussed in *Miller* can only be done at the time of the initial sentencing hearing—not 25 years in the future.

It is the trial court's role to consider "all mitigating circumstances attendant in the juvenile's crime and life," thus enabling the Board of Parole Hearings to later determine "whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.]" (*People v. Caballero*, *supra*, 55 Cal.4th at pp. 268-269 (*Caballero*).) Likewise, *Miller* establishes that the sentencing court must consider particular factors prior to imposing sentence. (*Miller*, *supra*, 132 S.Ct. at p. 2468.)

Our conclusion is buttressed by the California Supreme Court's resolution of a similar issue in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). In *Gutierrez*, the court considered the impact of *Miller* on section 190.5, subdivision (b), which had previously been interpreted "as establishing a presumption in favor of life without parole for juvenile offenders who were 16 years of age or older when they committed special circumstance murder." (*Gutierrez*, at p. 1369.) The California Supreme Court concluded

15

that "section 190.5[, subdivision ](b), properly construed, confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole." (*Id.* at p. 1360.) The *Gutierrez* court further held that "consideration of the *Miller* factors" is required when a sentencing court is determining whether to impose an LWOP sentence pursuant to section 190.5, subdivision (b). (*Gutierrez*, at p. 1387.)

The *Gutierrez* court considered whether section 1170, subdivision (d)(2) provided a substitute for the resentencing process mandated by *Miller*. (*Gutierrez, supra*, 58 Cal.4th at p. 1386.) Section 1170, subdivision (d)(2) provides a procedural mechanism for resentencing to defendants who were under the age of 18 at the time of the commission of their offenses and who were given LWOP sentences. If the defendant has served at least 15 years of the LWOP sentence, he or she may "submit to the sentencing court a petition for recall and resentencing" (§ 1170, subd. (d)(2)(A)(i)), so long as the LWOP sentence was not imposed for certain enumerated offenses (*id.*, subd. (d)(2)(A)(ii)).

The *Gutierrez* court rejected the Attorney General's argument that the "potential mechanism for resentencing" provided by section 1170, subdivision (d)(2) "mean[s] that the initial sentence 'is thus no longer effectively a sentence of life without the possibility of parole.'" (*Gutierrez, supra*, 58 Cal.4th at p. 1386.) The *Gutierrez* court reasoned: "A sentence of life without parole under section 190.5[, subdivision ](b) remains fully effective after the enactment of section 1170[, subdivision ](d)(2). That is why section 1170[, subdivision ](d)(2) sets forth a scheme for recalling the sentence and resentencing the defendant." (*Ibid.*, italics omitted.)

16

The *Gutierrez* court further rejected the Attorney General's claim that section 1170, subdivision (d)(2) "removes life without parole sentences for juvenile offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1386.) The court held that what *Miller* required for juvenile offenders sentenced to LWOP was not a "'meaningful opportunity to obtain release'" but a sentencing court's exercise of discretion "'at the outset.'" (*Ibid*., italics omitted.)

In sum, in light of our careful review of *Miller*, *Caballero*, *Gutierrez*, and *Chavez*, we conclude that the enactment of section 3051 does not render moot Ricardez's claim that his sentence is a de facto LWOP sentence that violates the Eighth Amendment.

## DISPOSITION

Because Ricardez's sentence of 75 years to life is a de facto life without parole sentence, he is entitled to resentencing under *Graham*, *Miller*, *Caballero*, and *Chavez*. Ricardez's sentence is reversed, and the matter is remanded for resentencing. In all other respects, the judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

O'ROURKE, J.

17