Filed 10/6/16  P. v. Santana CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDGAR SANTANA,<br><br>    Defendant and Appellant. | 2d Crim. No. B261900<br>(Super. Ct. No. BA373501)<br>(Los Angeles County) |

A jury convicted Edgar Santana of two counts of first degree murder (Pen. Code §§ 187, subd. (a); 189)[1] with multiple murder special circumstances (§ 190.2, subd. (a)(3)).  The jury also found true that as to one count, Santana personally and intentionally discharged a firearm causing death.  (§ 12022.53, subds. (b)-(d).)  The jury found as to both counts:  a principal personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (b)-(d), (e)-(i)); the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)); and Santana was a minor at least 14 years of age and the offenses were committed for the benefit of a criminal street gang (Welf. & Inst. Code § 707, subd. (d)(2)(B) & (C)(ii)).

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

The trial court sentenced Santana to two consecutive terms of life without the possibility of parole (LWOP) plus two consecutive 25-year terms for the firearm enhancements. (§ 12022.53, subd. (d).)

We amend the judgment to add 12 days custody credits. In all other respects, we affirm.

FACTS

On March 19, 2010, Laura Ramirez was walking near the corner of 61st Street and Avalon Boulevard when she noticed a white car. The car was traveling slowly on Avalon. She saw an arm holding a gun extend out of the passenger window. She heard gunshots. The car continued on Avalon. The driver of the car was a young Latino male. There were two or three passengers in the back of the car. Security cameras from a liquor store showed a white Mustang traveling by at the time of the shooting. When the police arrived minutes later, they found the body of victim Anthony Freeman, who had been fatally shot.

On June 23, 2010, brothers Raymond Bailey and Davion Jasper were preparing to go swimming with friends at a public pool. They all planned to meet at an apartment complex on 60th Street. While walking on 60th Street, Jasper saw Bailey talking to two girls. Jasper stopped to talk with them and then continued to the apartment complex to wait for Bailey. While waiting in the apartment courtyard, Jasper heard gunshots. Then he heard people saying that Bailey had been shot. Jasper went to the front of the complex and saw a Hispanic man running on 60th Street. The man jumped into the back seat of a car. Bailey died of a gunshot wound to the chest.

*Santana's Statements to the Police*

In July 2010, Los Angeles Police Department Detective Richard Compton was investigating a domestic violence complaint made against Santana by his girlfriend, Laurdes De La Cruz. Santana and De La Cruz were both 17 years old at the time. Compton arranged for Santana's mother, Maria Maximo, to bring him to the police station on the morning of July 12, 2010.

2

Santana arrived at the police station with his mother, between 8:00 a.m. and 8:30 a.m. De La Cruz arrived with them. Compton interviewed De La Cruz for a few minutes.

Compton then spoke to Santana in an interview room. Compton advised Santana of his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436.) Santana said he understood those rights and was willing to talk. He admitted he belonged to the Florencia 13 gang. His moniker is "Chato." He also admitted that he pushed De La Cruz. The interview lasted about 15 minutes.

Based on Santana's admission of a battery, Compton decided to arrest, book and release Santana to his mother. While Compton was out of the interview room arranging for Santana's arrest, he saw two homicide detectives, Richard Arciniega and Julio Benavides. Compton had heard about the shootings in Florencia territory and asked the detectives if they wanted to speak to a Florencia gang member. They said they did. Compton introduced the detectives to Santana, who had remained in the interview room. Compton asked Santana if he wanted to talk to the detectives and Santana agreed to talk to them.

The detectives asked Santana if he was affiliated with a gang. Santana said he was from Florencia and that his moniker was "Chato." The detectives asked who had jumped him into the gang. Santana said his neighbors "Flaxo," "G-Boy" and "Shy Boy."

The detectives asked Santana if he had heard about the shooting at 60th and San Pedro Streets. He said no. The detectives then asked if he had been on any "missions." Santana said yes. A "mission" is getting in a car and looking for somebody to shoot. The detectives stopped the questioning and advised Santana of his *Miranda* rights.

Santana told the detectives about the June 23 shooting. He said Shy Boy was the driver of a black Nissan. Santana was given a handgun and sat in the rear passenger seat. Flaxo was in the rear seat behind the driver. They drove around looking for a member of the East Coast Crips (ECC) gang. They saw two people on the corner of 60th and San Pedro Streets. Both sides threw gang signs. Santana got out of the car and shot the victim in the chest. He got back into the car and they fled the area.

3

The detectives asked Santana about other missions. Santana said they shot another man at 62nd Street and Avalon Boulevard a few months earlier. He said that he and G-Boy went to a store. At about 2:00 p.m. or 3:00 p.m., they encountered an ECC member who "kicked both their butts." They returned home and "chilled for a while" and "just kicked it." At about 7:00 p.m. or 8:00 p.m., G-Boy said, "Let's go." Santana, G-Boy and Shy Boy got into a Ford Mustang and returned to the area of the store. They saw the person who they believed beat them up earlier that day. G-Boy and Santana got out of the car with guns. They yelled "Florence" and G-Boy shot his gun. Santana said he did not shoot. They ran back to the car and fled the scene.

*Gang Evidence*

Los Angeles Police Officer Eric Rose testified as a gang expert. He said the Florencia 13 gang is known as "F13". It is a predominantly Hispanic gang of about 10,000 members. It is affiliated with the Mexican mafia. Members of the gang have adopted the Atlanta Falcon's football team gear and use unique gang graffiti, hand signs and tattoos.

Los Angeles County Sheriff's Department Detective Armondo Arevalo testified the F13 gang's primary activities include assaults with deadly weapons, robberies, carjackings, murders and other violent crimes. The People produced court records showing the convictions of three people for assault with a firearm, murder and attempted murder, all with gang enhancements. Arevalo testified that he worked on the assault case and knew the defendant to be a member of F13. He testified he did not know the other two defendants, but had been informed by other peace officers that the defendants were members of F13.

F13's main rival is ECC, a predominately African-American gang. When F13 members see a person they perceive to be a member of ECC, they will try to shoot him. ECC claims the territory where both homicides took place. Gang members can earn respect and clout if they shoot someone in a rival gang's territory.

Santana has F13 tattoos and a CK on his chest. CK stands for "Crip Killer." F13 members earn CK tattoos if they were involved in a shooting in which a member of ECC was killed or injured. Santana obtained the CK tattoo while in jail awaiting trial.

4

Arevalo opined, based on a hypothetical approximating the facts of the People's case, that the shootings of Freeman and Bailey were committed in association with and for the benefit of the F13 gang. Santana had the specific intent to promote further illegal conduct by gang members.

*Defense*

Angelica Sarmiento was working as a photographer at a swap meet in Los Angeles. On March 19, 2010, she took a photograph of Santana and his girlfriend during daylight hours.

Santana's mother picked up Santana from school at 3:15 p.m. on March 19, 2010. They picked up his girlfriend at her residence, and the three of them went to the swap meet. They were at the swap meet until 8:30 p.m., after which they dropped off Santana's girlfriend at her residence.

Santana's school records show he was in school all day except the last period of classes.

Santana did not testify on his own behalf.

DISCUSSION

*Mistrial*

Santana contends there was no legal basis for the trial court to declare a mistrial based on jury deadlock in the first trial. Defense counsel did not object.

Jury deliberations began at 3:00 p.m. on June 6, 2013, and adjourned at 4:00 p.m. Deliberations resumed on Monday, June 10, 2013, at 9:45 a.m. The jury took a break from 10:50 a.m. to 10:56 a.m. The jury took a lunch break from 11:50 a.m. to 1:30 p.m. At 2:18 p.m., the jury notified the trial court in writing that it was "hopelessly deadlocked" on both counts.

The jury foreperson told the trial court that the jury had taken two votes and the last vote was five to seven. The court then asked the jury: "Do you believe or does anybody on the jury believe there's anything I can do that would assist you? That would include if there is any instruction[] you are having a problem with possibly, going over that

5

instruction. It could include allowing counsel to argue the case, open it for more argument if you are having some problem with that." The foreperson replied, "Absolutely not."

The trial court asked the jurors to raise their hands if there was something the court could do to break the deadlock. No juror raised his or her hand. At a bench conference, the court told counsel, "To tell you the truth, they look angry." Defense counsel said, "yeah." The court also noted the five-to-seven division among the jurors is not "indicative of anyone being able to agree. If it was two or three, then you say, okay, well, maybe let them cool off tonight. I just don't see it." Defense counsel said, "I'd ask the court to go ahead and let them go."

The trial court asked the jury if anyone thought going home for the night and returning the next day might help. The court said, "I am seeing a lot of head shaking going on in a negative fashion." The court declared a mistrial and dismissed the jury.

A premature or unsupported grant of a mistrial on the ground of jury deadlock invokes the double jeopardy clauses of both the United States and the California Constitutions and prohibits retrial. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 425.) A trial court may declare a mistrial where there is a legal necessity to discharge the jury and start anew. (*Ibid.*) A legal necessity exists where it appears there is no reasonable probability the jury can agree. (*Ibid.*) The determination whether there is a reasonable probability of agreement rests in the discretion of the trial court. (*Id.* at p. 426.)

Here the jury foreperson reported that the jury was "hopelessly deadlocked," five to seven, on both counts. The trial court twice inquired if there was anything it could do to break the deadlock. The court also inquired if returning the next day would help. Each time the court got a negative response. The court noted that it was more than just two or three jurors who disagreed with the majority and that the jury looked angry. Under the circumstances, the court was well within its discretion in finding it is not reasonably probable the jury can reach an agreement. A mistrial was legally necessary.

Santana argues three factors establish an abuse of discretion. First, the trial court failed to inquire of the jury whether the deadlock was based on the issue of identity or on a particular count or counts. But the foreperson told the court the jury was

6

hopelessly deadlocked on both counts. In addition, Santana cites no authority requiring the court to inquire on what particular issues the jury disagrees.

Second, Santana argues the length of the jury's deliberations was only four hours, too short for a trial that lasted 13 days. But the length of the deliberations is not determinative. (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 426.) Here the jurors were almost evenly divided and angry. They told the trial court they were hopelessly deadlocked and there was nothing the court could do to help them reach a verdict. It is sheer speculation to say that more time would have resulted in an agreement. (*Ibid*.)

Third, Santana argues that the jurors divided five to seven and appeared angry are insufficient to support declaring a deadlock as a legal necessity. But those were not the only factors the trial court considered. In addition, the jurors told the court they were hopelessly deadlocked and there was nothing the court could do to help. Under all the circumstances the court did not abuse its discretion in declaring a mistrial.

It follows that Santana's counsel's performance was not deficient in failing to object to the declaration of mistrial and Santana's retrial.

*Miranda Warning*

Santana contends the trial court erred in refusing to suppress his incriminating statements. He claims the statements were obtained in violation of his *Miranda* rights.

Santana met with Detective Compton in an interview room at the police station. Compton advised Santana of his *Miranda* rights. Santana said he understood those rights and was willing to talk. After about 15 minutes, Compton decided to arrest Santana for assaulting his girlfriend. Compton left the interview room to process the arrest. Compton asked homicide detectives if they wanted to speak to Santana. The detectives said they did. Compton introduced the detectives to Santana at about 8:30 a.m. and the interview began at about 8:40 a.m. The detectives spoke with Santana in the interview room. Santana denied knowing about a shooting, but admitted he had been on "missions" for his gang. The detectives again gave Santana *Miranda* warnings. They gave

7

the warnings about 15 to 20 minutes into the interview. Santana agreed to talk. Thereafter, Santana admitted to having been involved in two murders.

Santana moved to suppress his statements prior to the first trial. The trial court denied the motion because Compton's initial advisement of Santana's *Miranda* rights applied to the homicide detectives' interview that occurred shortly after Compton's interview. The court found that the interviews were contemporaneous.

Santana renewed his motion before his retrial. The trial court again denied the motion.

A defendant may waive his *Miranda* rights. (*People v. Nelson* (2012) 53 Cal.4th 367, 374.) To establish a valid waiver, the People must prove by a preponderance of the evidence that the waiver was knowing, intelligent and voluntary. (*Id*. at pp. 374-375.) Determining the validity of a *Miranda* rights waiver requires an inquiry into all the circumstances of the interrogation. (*Id*. at p. 375.) When a juvenile's waiver is at issue, consideration must be given to factors such as his age, experience, education, background, intelligence and whether he has the capacity to understand the warnings, the nature of his Fifth Amendment rights and the consequences of waiving those rights. (*Ibid*.)

"[A] *Miranda* readvisement is not necessary before a custodial interrogation is resumed, so long as a proper warning has been given, and the 'subsequent warning is "reasonably contemporaneous" with the prior knowing and intelligent waiver.'" (*People v. Smith* (2007) 40 Cal.4th 483, 504.) Our Supreme Court has established several factors to determine whether readvisement is necessary: "1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that the defendant subjectively understands and waives his rights." (*Ibid*.)

Here Santana was initially advised of his *Miranda* rights by Detective Compton when the interrogation began between 8:00 a.m. and 8:30 a.m. The interrogation by the homicide detectives began less than an hour later at about 8:40 a.m. It is true there

8

were different interrogators, but Santana remained in the same interrogation room that he entered less than an hour before. There was no need to advise Santana of his *Miranda* rights twice in one hour. Moreover, when he was readvised of his *Miranda* rights, he reiterated that he understood his rights and was willing to talk.

The detectives did not deliberately withhold *Miranda* warnings until after questioning succeeded in eliciting incriminating statements. Santana received *Miranda* warnings before any questioning began.

Santana points out that he was only 17 years old at the time of questioning. He also claims psychological testing showed he has an intelligence level in the "borderline" range of 79. But Santana was not a young child. At 17, he was almost an adult. Nor is there any showing that what he describes as a "borderline" intelligence prevented him from making a knowing and intelligent waiver of his *Miranda* rights.

Santana argues that the detectives violated Welfare and Institutions Code section 627 by failing to notify his parents that he was being interviewed. But the Legislature has not authorized exclusion of evidence as a remedy for a violation of section 627, and the Truth-in-Evidence law (Cal. Const., art. I, § 28, subd. (f)(2)) bars courts from creating such a remedy. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1170.)

*Suppression Motion*

Santana contends the trial court erred in denying his suppression motion. He claims his confession was made during an unduly prolonged detention.

Although a defendant may be detained for a reasonable time to allow officers to complete the matter for which the defendant was detained, an unduly prolonged detention can violate the Fourth Amendment ban on unreasonable searches and seizures. (See *United States v. Sharpe* (1985) 470 U.S. 675.) To justify the suppression of an admission or confession, the defendant must show that there was a causal connection between the illegal detention and the admission of guilt. (*People v. Hughes* (2002) 27 Cal.4th 287, 326.)

Here Detective Compton spoke with Santana for about 15 minutes during which Santana admitted he pushed his girlfriend. Compton left the interview room to start

the booking process. Compton testified the booking process could take from one to three hours, depending on how long the wait was at the jail. Detective Arciniega testified the entire interview with the homicide detectives lasted about 30 to 45 minutes, well within the time it would have taken to book Santana. Thus Santana's detention was not unduly prolonged.

*Defense Expert Testimony on Confession*

Santana contends the trial court erred in excluding a defense expert's testimony on false confessions.

Santana sought to introduce the expert testimony of Dr. Richard Leo on false confessions. The People objected that the testimony was irrelevant because there was no evidence the confession was false. Santana argued that inconsistencies between his confession and the testimony of witnesses and the physical evidence show the confession was false.

The trial court sustained the People's objection. The court ruled that inconsistencies are not sufficient to show the confession is false. Unless Santana testifies the confession is false or there is some evidence the confession is false, there is insufficient foundation for the expert testimony. Santana elected not to testify.

The trial court has broad discretion in deciding to admit or exclude expert testimony, and we review its ruling for an abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

In *People v. Linton* (2013) 56 Cal.4th 1146, the trial court excluded expert testimony on false confession under Evidence Code section 352. In upholding the court's ruling, our Supreme Court stated: "As was his right, defendant did not testify and thus did not deny the truth of his interview statements. There was no other evidence offered that logically called into question the veracity of his admissions. The only evidence that defendant pointed to as showing he made *any* false statements during his police station interview was the testimony of the two pathologists that [the victim] was not likely strangled from the front in the manner described by defendant. And yet Dr. Choi testified that the linear marks on [the victim's] neck could have resulted from a cord placed around

10

[the victim's] neck if her hair was in between the cord and her neck and if the ligature was pulled from one side or another, a scenario not wholly unlike defendant's uncertain recollection of his precise actions." (*Linton* at pp. 1181-1182.)

It is not always the case that the defendant must testify that his confession is false before there is sufficient foundation for expert testimony. It may be, for example, that the physical evidence renders the confession improbable. But that is not the case here. It is not unusual that there will be details in a confession that differ from the statements of witnesses and the physical evidence. The differences are not due to a false confession, but to the imprecision of recollection. Similarly, defendants seldom confess immediately upon being interrogated. It is typical for a defendant to deny, equivocate and try to deflect blame before finally confessing. Santana points to nothing about his confession, or any other evidence, sufficient to indicate his confession was false. The trial court did not abuse its discretion in excluding expert testimony on false confessions as irrelevant.

Santana's reliance on *People v. McDonald* (1984) 37 Cal.3d 351, 361-377, is misplaced. *McDonald* held it was error for the trial court to exclude expert testimony on the psychological factors that may affect the accuracy of eyewitness identification. But, unlike this case, in *McDonald* there was no question of a sufficient foundation in the evidence to make such testimony relevant. Moreover, *McDonald* reiterated that the admission of such expert testimony remains a matter within the trial court's discretion, and that, in the usual case, the appellate court will defer to the trial court's discretion. (*Id*. at p. 377.)

*Voluntary Manslaughter*

Santana contends the trial court erred in failing to give a sua sponte instruction on voluntary manslaughter. Santana claims there was evidence he acted in the heat of passion in the Freeman shooting.

The trial court has a sua sponte duty to instruct on lesser offenses when the evidence raises a question whether all of the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. (*People v.*

11

*Barton* (1995) 12 Cal.4th 186, 194-195.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.)

An unlawful killing is voluntary manslaughter if the defendant acts in a "sudden quarrel or heat of passion." (§ 192, subd. (a).) Heat of passion arises when, at the time of the killing, the defendant's reason was obscured by passion to such an extent as to cause the ordinary reasonable person to act rashly without deliberation or reflection. (*People v. Barton*, *supra*, 12 Cal.4th at p. 201.) Heat of passion has both an objective and subjective component. (*People v. Moye* (2009) 47 Cal.4th 537, 549.) Not only must the provocation be such as to cause a reasonable person to act rashly, the defendant must be actually under the influence of a heat of passion at the time of the killing. (*Id.* at p. 550.)

Santana did not testify. But he told the homicide detectives that he and G-Boy first encountered an ECC member at about 2:00 p.m. or 3:00 p.m. The ECC member "kicked both their butts." The shooting did not take place until 7:00 p.m. or 8:00 p.m. On appeal, Santana asserts in his opening brief that the shooting occurred "after several hours of simmering or boiling anger." But that is not what Santana told the detectives. He told the detectives that between the beating and the shooting they "chilled for a while" and "just kicked it." Then it was G-Boy, not Santana, who said, "Let's go" before they went to look for an ECC member. Santana told the detectives that G-Boy shot Freeman and that Santana never shot his gun.

There is no evidence from which a reasonable juror could conclude Santana acted in the heat of passion. The shooting occurred hours after the fight. In the interim, Santana and the gang members "chilled" and "kicked it." It was G-Boy who instigated the hunt for an ECC member and G-Boy who did the actual shooting. Santana never suggested he was anywhere close to a heat of passion at the time of the shooting.

In any event if there was error, it was harmless. The jury found that Santana committed a willful, deliberate and premeditated murder. Such a state of mind is "manifestly inconsistent with having acted under the heat of passion." (*People v. Wharton* (1991) 53 Cal.3d 522, 572.)

12

*Gang Evidence*

While this appeal was pending, our Supreme Court decided *People v. Sanchez* (2016) 63 Cal.4th 665, a case concerning the role of hearsay in expert testimony on gangs. We requested further briefing.

*Sanchez* acknowledged that an expert may rely on hearsay as a basis for his knowledge on the subject matter of his expertise. (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 676.) But an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.) The court defined case-specific facts as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.)

Here Santana argues the gang expert relied on inadmissible evidence to formulate his opinion that Santana and his accomplices were members of the F13 gang, and that the two homicides were committed with the intent to benefit the F13 gang. But Santana admitted to police detectives that he and his accomplices were members of the F13 gang. Santana also admitted that in both murders he acted with gang members. Any error in admitting the gang expert's testimony was harmless by any standard.

*Gang Enhancement*

Santana contends the trial court erred in instructing on the gang enhancement.

Section 186.22, subdivision (f), the gang enhancement statute, defines "criminal street gang" as "any ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [subdivision (e)] . . . ."

Detective Arevalo testified F13's primary activities include murder, attempted murder, assault with a deadly weapon, robbery and carjacking. Expert testimony may provide sufficient evidence of a gang's primary activities. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.)

13

Here the trial court instructed with CALCRIM No. 1401 that the jury must find as one or more of the gang's primary activities "the commission of Felony Vandalism, Robbery, Assault With Deadly Weapon, Murder, Attempted Murder . . . ."

Santana argues the trial court erred in failing to define the crimes constituting the gang's alleged primary activities. Santana cites the bench notes to CALCRIM No. 1401, which state in part: "The court should also give the appropriate instructions defining the elements of crimes inserted in the list of alleged 'primary activities,' or the definition of 'pattern of criminal gang activity' that have not been established by prior convictions or sustained juvenile petitions." The bench notes cite no authority for the statement.

There was no need for the trial court to instruct on the elements of the crimes that constitute the gang's primary activities. The prosecutor need not prove the elements. It is sufficient if an expert names the particular crimes that constitute the gang's primary activities. (*People v. Sengpadychith*, *supra*, 26 Cal.4th at 322 [primary activities requirement satisfied by the testimony of a police gang expert that primary activities of the gang were drug dealing and witness intimidation].) The prosecutor relied on such expert testimony here.

*Sentencing*

Santana contends the matter must be remanded for another sentencing hearing because the trial court failed to consider the ultimate question required by *Miller v. Alabama* (2012) 567 U.S. __ [183 L.Ed.2d 407], and *People v. Gutierrez* (2014) 58 Cal.4th 1354.

Santana was 16 years old at the time of the first murder and 17 at the time of the second. The trial court imposed two consecutive LWOP sentences.

*Miller* held that mandatory LWOP sentencing for juvenile homicide offenders violates the Eighth Amendment ban on cruel and unusual punishment. The court further stated that in exercising its discretion whether to impose an LWOP sentence on a juvenile homicide offender, the court must consider five factors: (1) the inherent impact of the juvenile's age on his culpability; (2) the juvenile's home and family environment; (3) the circumstances of the homicide offense; (4) the juvenile's cognitive ability to deal with

14

law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) the possibility of rehabilitation. (*Miller v. Alabama*, *supra* 567 U.S. at p. __ [183 L.Ed.2d at pp. 423-424].)

Section 190.5, subdivision (b) provides that the penalty for 16- or 17-year-old juveniles who commit special circumstances murder is "confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." Prior to *Miller*, many courts interpreted the section to mean that LWOP was presumed to be the appropriate penalty. *Gutierrez* determined that such a presumption conflicted with *Miller*. (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1379.) *Gutierrez* also repeated the five factors the court must consider in exercising its discretion whether to impose an LWOP sentence. (*Id*. at pp. 1388-1389.)

Santana submitted a sentencing memorandum analyzing the *Miller*/*Gutierrez* factors. Attached to the memorandum is a psychological report prepared by Rahn Minagawa, Ph.D. Minagawa also testified at the sentencing hearing.

Santana does not contest that the trial court considered the *Miller*/*Gutierrez* factors in sentencing him. Instead he relies on *People v. Chavez* (2014) 228 Cal.App.4th 18, 33, where the court stated: "As we read *Miller* and *Gutierrez*, the enumerated factors are not ends in themselves but rather are, when considered together in a reasoned manner, the useful and necessary means by which a sentencing court must determine whether transient immaturity requires some degree of leniency or irreparable corruption must be punished as severely as possible." *Chavez* stated the "ultimate question" is whether the defendant's crimes reflect transient immaturity or irreparable corruption. (*Ibid*.)

In *Chavez*, the trial court sentenced the defendants before *Miller* was decided. Thus the court could not have considered the factors required by *Miller*. The Court of Appeal had to decide whether to remand the matter for resentencing. In deciding to remand the matter, the court stated there is nothing in the record to show the trial court considered the ultimate question. (*People v. Chavez*, *supra*, 228 Cal.App.4th at p. 34.)

But neither *Chavez* nor any other case requires a court to consider the ultimate question as a separate factor. Instead, the answer to the ultimate question is the

15

logical product of the trial court's consideration of the factors stated in *Miller* and *Gutierrez*. Because in this case, unlike in *Chavez*, the court considered the factors stated in *Miller* and *Gutierrez*, there was no need for the court to separately consider what *Chavez* terms "the ultimate question".

In any event, here during defense counsel's argument at the sentencing hearing, the trial court stated, "You're talking about the 'irreparably corrupted' portion of it." Defense counsel replied, "Right." The court considered the ultimate question.

*Custody Credits*

The People concede Santana is entitled to 12 additional days custody credits for a total of 1,661 days.

DISPOSITION

The judgment is amended to add 12 days custody credits. In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


GILBERT, P. J.


We concur:



YEGAN, J.



PERREN, J.


16

Bob S. Bowers, Jr., Judge

Larry P. Fidler, Judge

Superior Court County of Los Angeles

_____


Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Chung L. Mar, Deputy Attorney General, for Plaintiff and Respondent.